CITY OF HARTFORD et al.,
Plaintiffs-Appellees,

v.

TOWNS OF GLASTONBURY et al.,
Defendants-Appellants.

Nos. 76, 198 and 199.   Dockets 76–6049, 76–6050 and 76–6059.

United States Court of Appeals,
Second Circuit.

Argued Sept. 16, 1976.

Decided Dec. 23, 1976.

On Rehearing En Banc Aug. 15, 1977.

Ralph G. Elliot, Hartford, Conn., for appellant Town of Glastonbury.

John J. Langenbach, West Hartford, Conn., for appellant Town of West Hartford.

James A. Wade, Hartford, Conn., for appellant Town of East Hartford.

Richard F. Bellman, New York City (Mary R. Hennessey and Barry S. Zitser, Hartford, Conn., of counsel), for appellees.

Anthony J. Steinmeyer, Atty., Dept. of Justice, and Robert P. vom Eigen, Atty., Dept. of Housing and Urban Development, Washington, D.C. (Rex E. Lee, Barbara Allen Babcock, Asst. Attys. Gen., Peter C. Dorsey, U.S. Atty., Morton Hollander, Atty., Dept. of Justice, Arthur J. Gang, Atty., Dept. of Housing and Urban Development, Washington, D.C., of counsel), for

Secretary of Housing and Urban Development as amicus curiae.

Before SMITH, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

The history of federal aid to the beleagured cities of the United States has seen a transition from urban renewal to the Model Cities Program, which expanded categorical grants for urban needs, to general revenue sharing in the 1970s, with accompanying block grants in general functional areas, such as manpower training, education and law enforcement. One of the more recent block grant programs is that for "community developments grants," authorized by the Housing and Community Development Act of 1974, § 103, 42 U.S.C. § 5303 (Supp. V 1975). This appeal, apparently the first of its kind to be decided under the 1974 Act,[1] requires us to decide whether the Department of Housing and Urban Development (HUD) improperly approved certain applications for community development grants.

The City of Hartford, Connecticut, and two of its low-income residents have sued to enjoin seven suburban communities from receiving or expending grants approved by HUD under the Act, principally on the ground that the grant applications either contained no estimate, or an arbitrary, wholly inaccurate estimate, of the number of lower income persons "expected to reside" within the community, an apparent violation of 42 U.S.C. § 5304(a)(4)(A) (Supp. V 1975). A permanent injunction was entered by the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, Judge. *City of Hartford v.*

---

1. *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), was an attack upon HUD housing policies generally, and the remedial order under review was issued in 1969, long before passage of the Housing and Community Development Act. The *Gautreaux* Court did refer to the 1974 Act, however, *id.* at 304–305 n. 21, 96 S.Ct. at 1549–1550 n. 21, including quotation of the Title I objective of "promoting greater choice of housing opportunities and avoiding undue concentration of assisted persons," 42 U.S.C. § 5304(a)(4)(C)(ii),

and citation of the district court's opinion in the instant case. 425 U.S. at 305 n. 21, 96 S.Ct. at 1550.

There is a district court decision dealing with alleged deficiencies in a grant application submitted under Title I of the Act, the court holding that the plaintiffs had produced insufficient evidence that the application had been improperly approved. *Ulster County Community Action Comm., Inc. v. Koenig*, 402 F.Supp. 986, 990 (S.D.N.Y.1975).

*Hills*, 408 F.Supp. 889 (D.Conn.1976). The towns of Glastonbury, West Hartford and East Hartford appeal; HUD does not appeal, nor do the other towns that were originally defendants and have been enjoined by the order below. We affirm.

## I. FACTS

### A. *The Structure of the Act*

Title I of the Housing and Community Development Act of 1974 established a new system of federal assistance for community development activities, to be administered by HUD, and consolidated and superseded previous categorical programs,[2] each of which had specified purposes and particular statutory and administrative restrictions. Title I, in short, was intended to create a streamlined program dealing comprehensively with urban problems previously addressed in a piecemeal fashion. *See* S.Rep. No. 93–693, 93d Cong., 2d Sess. 1–2, 48–49, *reprinted in* [1974] U.S.Code Cong. & Admin.News pp. 4273, 4273–74, 4318–19; H.R. Rep. No. 93–1114, 93d Cong., 2d Sess. 2–3 (1974). The community development grants authorized by the Act may be used by localities in a variety of ways related to improvement of the physical and economic environment, such as for the acquisition of blighted land and historic sites, the construction or improvement of street lights and playgrounds, the enforcement of housing codes in deteriorating areas, and the development of community and management planning capabilities. 42 U.S.C. § 5305 (Supp. V 1975); *see* 24 C.F.R. § 570.200(a) (1976). The Title I funds may not be used, however, for the construction of housing or the payment of housing allowances, with minor exceptions not relevant here, *id.* § 570.201(f), (g).[3] These matters are covered elsewhere in the Act, particularly in Title II, codified at 42 U.S.C. § 1437 *et seq.* (Supp. V 1975).

In terms of administrative review, Title I represents a compromise between the Administration's revenue sharing approach, under which communities would have automatically received funds on the basis of objective needs criteria, without any application or review process, and the approach favored by some members of Congress, which would have imposed substantial federal preconditions to grant awards and established elaborate application and review procedures. *See generally* Fishman, *Title I of the Housing and Community Development Act of 1974: New Federal and Local Dynamics in Community Development*, 7 Urban Law. 189, 191–200 (1975). The Act requires that communities apply to HUD, 42 U.S.C. § 5304(a) (Supp. V 1975), but limits HUD's review power in several ways. Cities and counties are declared "entitled" to the grant funds, *id.* § 5306(a), and an application is deemed approved 75 days after receipt by HUD unless the Secretary gives the applicant "specific reasons for disapproval," *id.* § 5304(f). The Secretary must approve an application, moreover, unless she determines, *inter alia*, that the applicant's description of community "needs and objectives is plainly inconsistent with [generally available] facts or data," *id.* § 5304(c).[4] Finally, with regard to require-

2. The programs consolidated included ones for urban renewal, Model Cities, water and sewer facilities, and open-space land. *See* 42 U.S.C. § 5316; *City of Hartford v. Hills*, 408 F.Supp. 889, 897 n. 27 (D.Conn.1976).

3. The exceptions relate to use of funds for so-called "last resort housing," *see* 24 C.F.R. § 43.1 *et seq.* (1976), and for relocation assistance payments for persons displaced by activities funded by grant monies, *see id.* § 570.-200(a)(11).

4. 42 U.S.C. § 5304(c) (Supp. V 1975) provides in full:

> The Secretary shall approve an application for an amount which does not exceed the amount determined in accordance with section 5306(a) of this title unless—
>
> (1) on the basis of significant facts and data, generally available and pertaining to community and housing needs and objectives, the Secretary determines that the applicant's description of such needs and objectives is plainly inconsistent with such facts or data; or
>
> (2) on the basis of the application, the Secretary determines that the activities to be undertaken are plainly inappropriate to meeting the needs and objectives identified by the applicant pursuant to subsection (a) of this section; or

ments that an applicant comply with certain civil rights laws and provide for citizen participation in the grant planning process, the Secretary may rely upon the "satisfactory assurances" of the applicant, rather than make an independent investigation. *Id.* § 5304(a)(5), (6).

While community development grants may not be used for housing, Title I was designed in part to "[foster] the undertaking of housing and community development activities in a coordinated and mutually supportive manner." *Id.* § 5301(d)(4). Moreover, specific objectives of the Title include provision of "a decent home," especially for those with low and moderate incomes, *id.* § 5301(c)(3), and "the spatial deconcentration of housing opportunities for persons of lower income," *id.* § 5301(c)(6).[5] In accordance with these goals, the grant application submitted to HUD must include a "housing assistance plan" (HAP) that "accurately surveys the condition of the housing stock in the community and assesses the housing assistance needs of lower-income persons . . . residing in or expected to reside in the community . . .," *id.* § 5304(a)(4)(A), with "a realistic annual goal" specified for housing assistance, *id.* § 5304(a)(4)(B).[6] The housing needs de-

(3) the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this chapter.

5. 42 U.S.C. § 5301(c) (Supp. V 1975) provides in full:

The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income. Consistent with this primary objective, the Federal assistance provided in this chapter is for the support of community development activities which are directed toward the following specific objectives—

(1) the elimination of slums and blight and the prevention of blighting influences and the deterioration of property and neighborhood and community facilities of importance to the welfare of the community, principally persons of low and moderate income;

(2) the elimination of conditions which are detrimental to health, safety, and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities;

(3) the conservation and expansion of the Nation's housing stock in order to provide a decent home and a suitable living environment for all persons, but principally those of low and moderate income;

(4) the expansion and improvement of the quantity and quality of community services, principally for persons of low and moderate income, which are essential for sound community development and for the development of viable urban communities;

(5) a more rational utilization of land and other natural resources and the better arrangement of residential, commercial, industrial, recreational, and other needed activity centers;

(6) the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial deconcentration of housing opportunities for persons of lower income and the revitalization of deteriorating or deteriorated neighborhoods to attract persons of higher income; and

(7) the restoration and preservation of properties of special value for historic, architectural, or esthetic reasons.

It is the intent of Congress that the Federal assistance made available under this chapter not be utilized to reduce substantially the amount of local financial support for community development activities below the level of such support prior to the availability of such assistance.

6. 42 U.S.C. § 5304(a)(4) (Supp. V 1975) provides in full (emphasis added):

No grant may be made pursuant to section 5306 of this title unless an application shall have been submitted to the Secretary in which the applicant—

. . . . .

(4) submits a housing assistance plan which—

(A) accurately surveys the condition of the housing stock in the community and *assesses the housing assistance needs of lower-income persons* (including elderly and handicapped persons, large families, and persons displaced or to be displaced) *residing in or expected to reside in the community,*

(B) specifies a realistic annual goal for the number of dwelling units or persons to be assisted, including (i) the relative proportion of new, rehabilitated, and existing dwelling units, and (ii) the sizes and types of housing projects and assistance *best suited to the needs of lower-income persons in the community,* and

(C) indicates the general locations of *proposed housing for lower-income persons,*

tailed in the HAP can then be met with funds available under Title II of the Act. Thus (and this is crucial to the case) the HAP serves as the vehicle tying together the community development and housing assistance portions of the Act, in further-ance of the Act's overall goal of coordina-tion of federal urban efforts, see id. § 5301(d). The critical importance of the HAP in the overall scheme of the 1974 Act is underscored in the Act itself [7] and in the legislative history; [8] it has been recognized by HUD [9] and was fully appreciated by the court below.[10]

### B. Appellants' Grant Applications

The three suburban towns here involved submitted applications for community de-velopment grants to HUD in the spring of 1975, after having first sent the applica-tions "for review and comment" to the Hartford region's areawide planning agen-cy, the Capital Region Council of Govern-ments (CRCOG), pursuant to 42 U.S.C. § 5304(e) (Supp. V 1975). The CRCOG re-ceived adverse comments on the HAP and other aspects of the applications from the City of Hartford and a Hartford civil rights group, and it forwarded these comments to

HUD. The HUD regional director in Bos-ton, in a late April memorandum to the director of HUD's Hartford office, found the City's comments in particular to be "well documented and of a very serious nature." In addition, the area director of HUD's Equal Opportunity Division recom-mended disapproval of all three applica-tions.

While the Hartford office was in the process of reviewing the applications in light of these criticisms, it received a May, 1975, memorandum from HUD's Assistant Secretary for Community Planning and De-velopment. That memorandum recognized that both grant applicants and HUD were having difficulty estimating the number of low-income persons "expected to reside in the community," an estimate central to the HAP, see note 6 supra, and suggested possi-ble sources of data from which HUD might develop its own figures. It also gave appli-cants an option that eventually led to this case: instead of developing its own "ex-pected to reside" figure or accepting HUD's, a locality could obtain approval of its application simply by "indicat[ing]" the steps it would take to "identify a more

with the objective of (i) furthering the revital-ization of the community, including the resto-ration and rehabilitation of stable neighbor-hoods to the maximum extent possible, (ii) promoting greater choice of housing opportu-nities and avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons, and (iii) assuring the availability of public facilities and services adequate to serve proposed housing projects[.]

7. 42 U.S.C. § 5304(b)(3) and (4) (Supp. V 1975) together allow the Secretary of HUD under certain conditions, to waive or otherwise dis-pense with all of the application requirements in subsection (a) except the housing assistance plan requirement. The district court observed that this exclusion showed "the pivotal role [Congress] intended for the HAP." 408 F.Supp. at 898; see id. at 901.

8. The House Report states:
   This [housing assistance plan] requirement, together with provisions in title II of the bill which allocate housing assistance funds to communities based, in part, on the housing needs specified in these plans, will make it possible for communities to plan unified community development and housing pro-

grams. For the first time, after nearly three decades, of Federal aid for housing and com-munity development, communities will be able to coordinate the location of new hous-ing units with existing or planned public fa-cilities and services, such as schools, trans-portation, police and fire protection, recrea-tional facilities, and job opportunities. The committee bill will put an end to a system of support for community development and housing activities which recognizes their close relationship but fails to provide the mechanisms necessary to permit them to be undertaken on a unified basis.
H.R.Rep. No. 93–1114, 93d Cong., 2d Sess. 3 (1974).

9. The "Notice of Proposed Rulemaking" that introduced part of the proposed HUD Title I regulations termed the HAP "one of the most significant parts of the community develop-ment application process" and mentioned its "significant impact on various aspects of HUD-assisted housing program activities." 41 Fed. Reg. 2348 (1976).

10. 408 F.Supp. at 898.

appropriate needs figure by the time of its second year submission." The memorandum was quite explicit as to the meaning of this option: HUD would not require the adoption of *any* "expected to reside" figure on first year grant applications such as those in issue here.

Appellants West Hartford and Glastonbury, along with several other towns, accepted the option offered by HUD and thus submitted·zero figures for the "expected to reside" portion of the HAPs in the final applications approved by HUD.[11] The two towns were granted $999,000 and $910,000 respectively. East Hartford's application had been approved prior to receipt of HUD's May memorandum, and it contained an "expected to reside" figure of 131, derived exclusively from the waiting list of the town's public housing authority. East Hartford was granted $440,000.

## II. STANDING

Appellants challenge the standing of both the City of Hartford and the low-income plaintiffs to seek the injunction granted by the court below. The district court concluded that both had standing, 408 F.Supp. at 893–97, but it lacked the benefit of our *en banc* decision in *Evans v. Lynn*, 537 F.2d 571, 589 (2d Cir. 1976), *petition for cert. filed*, 45 U.S.L.W. 3346 (U.S. Oct. 29, 1976), which is primarily relevant to the claim of the low-income plaintiffs.[12] We find *Evans*

to be distinguishable from the instant case and affirm the district court's decision upholding the standing of all appellees.

### A. The City of Hartford

The standing of the City here is dependent upon a showing both that the City has been injured "in fact" by HUD's approval of the challenged grants and that the interest the City seeks to protect is one "arguably within the zone of interests to be protected . . . by the statute." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); see *Evans v. Lynn, supra*, 537 F.2d at 592. Since the injury in fact test must be met at the threshold, 537 F.2d at 592; *see* K. Davis, *Administrative Law of the Seventies*, § 22.02–1, at 487 (1976), we turn first to its application to the City.

The district court found that Hartford had been injured by HUD's approval of the grants because, if the grants had been disapproved, the amounts allocated for them would have been reallocated, pursuant to 42 U.S.C. § 5306(e) (Supp. V 1975), to other Connecticut "metropolitan areas" (defined in *id.* § 5302(a)(3) to mean "standard metropolitan statistical areas [SMSAs] as established by the Office of Management and Budget"), among which Hartford would have had a priority position. 408 F.Supp. at

---

11. Appellants have raised the fact that Hartford itself, in applying for community development funds (which it received), also submitted a zero "expected to reside" figure in its HAP. Since Hartford's application was never challenged on this ground, however, its "expected to reside" figure is irrelevant to the claim against appellants. There was testimony before the district court, moreover, indicating that Hartford's zero figure was not necessarily a result of HUD's May memorandum, but was rather based upon consideration of current and projected population trends. Hartford's Director of Planning stated that Hartford's population was declining, so that, while its application listed a large number of low-income persons residing in the city, it was expected that any new low-income residents would be offset numerically by others leaving Hartford for the suburbs, where the population was increasing. He thus concluded that Hartford's zero figure

for new low-income residents was both "fair" and "realistic."

12. The *Evans* plaintiffs were low-income persons, and thus, in view of the importance of a case's particular facts in resolving standing issues, *see The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 47, 189 & n. 7 (1975), *Evans* has little direct relevance to the question of the City's standing. The district court in *Evans*, in denying standing, expressly stated that a city "would be in a peculiarly appropriate position" for standing in a case of this sort, *Evans v. Lynn*, 376 F.Supp. 327, 333 (S.D.N.Y.1974) (dictum), *aff'd*, 537 F.2d 571, 589 (2d Cir. 1976) (en banc), a proposition with which Chief Judge Kaufman has concurred, 537 F.2d at 611 n. 10 (dissenting opinion). Of course, as the following discussion makes evident, *Evans* does provide some general guideposts for our decision with regard to the City's standing.

894–95. Appellants argue that, under the statute as modified by HUD regulations, 24 C.F.R. § 570.409(f)(1) (1976), Hartford's position is no better than that of all other towns—we would add, except those with disapproved applications—in the Hartford SMSA. But this demonstrates at most that Hartford's financial stake may not be as large as the sum of all the grants involved in this litigation; it is a long way from proving that Hartford lacks a stake altogether. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (plaintiff showing "distinct and palpable injury to himself" has standing, even if large group shares the injury); K. Davis, *supra,* § 22.02–10, at 507 ("The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury."). Appellant's argument, moreover, does not recognize that HUD is unlikely to reallocate funds to localities that did not apply originally for community development funds in 1975; with these localities and the seven towns enjoined below eliminated from the reallocation pool, only Hartford and two other towns in the SMSA would remain eligible.

Appellants further argue that reallocation funds will be distributed only to applicants with "urgent needs," citing 24 C.F.R. § 570.401(b) (1976) (defining "urgent needs") and *id.* § 570.409(d), (f) (establishing criteria and priorities for reallocation), and that Hartford has shown no such needs. There is no indication, however, that Hartford—a city with a high concentration of lower income and unemployed persons and welfare recipients, *see* 408 F.Supp. at 893–94 n.14, and thus likely to have some of the financial resources problems to which the "urgent needs" definition is addressed, *see* 24 C.F.R. § 570.401(b) (1976)—will not be able to make the requisite showing when it applies to HUD for reallocation funds, as it has indicated its intention to do, *see City of Hartford v. Hills,* 408 F.Supp. 879, 885–86 (D.Conn.1975) (decision granting preliminary injunction). Appellants' argument essentially would require a city to present its reallocation application to the district court, rather than to HUD, before the court makes the decision that releases funds to be reallocated. Such a requirement would be at least wasteful of resources, since the court could decide that HUD had correctly approved challenged grants, and in any event would require a city to make a far more detailed showing of injury than any previous case has required, *see Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. at 2208 (plaintiffs need only "allege" facts from which it can "reasonably . . . be inferred that . . . there is a substantial probability" of injury). The strong likelihood that Hartford will receive reallocated funds, while not an absolute certainty, is therefore sufficient to establish that Hartford will "benefit in a tangible way from the courts' intervention." *Id.* at 508, 95 S.Ct. at 2210; *cf. Evans v. Lynn, supra,* 537 F.2d at 595 (no injury in fact shown when plaintiffs "claim[ed] only that, had the grants not been approved, the monies *could conceivably* have gone to some other, as yet *totally imaginary* project . . . which *might* have" benefited plaintiffs (emphasis in original)).

There is a second, less quantifiable way in which the City has been injured by HUD's approval of the grants. The district court found that "[t]he housing situation in Hartford is bleak," referring especially to the high concentration of subsidized, low-rent housing in the City relative to the greater Hartford region and to the overcrowding caused by a housing shortage in the City. 408 F.Supp. at 893–94 n.14. The elimination or amelioration of precisely these sorts of problems is an explicit goal of the Act: 42 U.S.C. § 5301(c) (Supp. V 1975), quoted in full at note 5 *supra,* declares that the grants authorized are for the support of activities with such objectives as "the elimination of slums and blight" and "conditions . . . detrimental to health, safety, and public welfare," and, most importantly for present purposes,

the reduction of the isolation of income groups within communities and geographical areas and the promotion of an increase in the diversity and vitality of neighborhoods through the spatial decon-

centration of housing opportunities for persons of lower income . . . .

*See also id.* § 5301(a)(1) (declaration of Congress that urban problems arise from, *inter alia,* "the concentration of persons of lower income in central cities"). This spatial deconcentration objective, the district court found, cannot be met unless an estimate is made of the number of lower income persons "expected to reside" in the community. 408 F.Supp. at 901–02. The Act's legislative history also suggests a close relationship between spatial deconcentration and the "expected to reside" figure. *See* H.R. Rep. No. 93–1114, *supra,* at 3, 6–7. It follows that, when the Secretary approved applications without these estimates, she was substantially lessening the probability that the towns would use the funds received to promote spatial deconcentration and related objectives. Since Hartford would have been the direct beneficiary of spatial deconcentration efforts by its suburbs—to take a concrete example, the City's welfare and housing subsidy outlays would be decreased if large numbers of lower income persons moved to the suburbs—the City was plainly injured by the Secretary's approval of grant applications lacking "expected to reside" figures.[13]

In addition to establishing injury in fact, we take it that Hartford must show that the interest it seeks to protect is "arguably within the zone of interests to be protected . . . by the statute." *Association of Data Processing Service Organizations v. Camp, supra,* 397 U.S. at 153, 90 S.Ct. at 830.[14] The statute here, like the one in *Data Processing,* "do[es] not in terms protect a specified group. But [its] general policy is apparent. . . ." *Id.* at 157, 90 S.Ct. at 832. The objectives quoted in the preceding paragraph indicate a concern about persons of low and moderate income, but, contrary to appellants' suggestion, these individuals as individuals are not the only concern of the Act. "The primary objective of [Title I] is the development of viable urban communities . . . ." 42 U.S.C. § 5301(c) (Supp. V 1975). In the list of the purposes for which grants are to be awarded, one finds repeated references to this theme, expressed in terms of "the welfare of the community," "improvement of . . . community services," "sound community development," and "the revitalization of . . . neighborhoods." *Id.* § 5301(c)(1), (4), (6); *see* note 5 *supra.* As the legal entity responsible for representation of the community as a community, Hartford plainly has an interest that falls within the zone of interests protected by the Act. We agree with the district court's conclusion: "[T]here can be no doubt that the statute was intended to ameliorate the

---

13. The City's claim of injury in this respect is quite different from the injury allegedly suffered by a city's taxpayers ·in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The taxpayers asserted that the exclusionary zoning policies of a suburb forced the city to provide more public housing, which in turn increased the tax burden on the taxpayer plaintiffs. The *Warth* Court held they lacked standing on alternative grounds: first, because their injury resulted, not from the challenged zoning policies, but from decisions to build public housing on the part of city officials; and, second, even assuming injury, because plaintiffs were not asserting any personal right to be free óf the suburb's adverse zoning policies, but were asserting rights of third parties. 422 U.S. at 508–10, 95 S.Ct. 2197.

By contrast, Hartford's injury here stems from a decision, not by its own officials, but by the Secretary of HUD, an injury over which Hartford had no control. *Cf. The Supreme Court, 1974 Term, supra,* 89 Harv.L.Rev. at 192 (distinguishing injury in *Warth* from one result-

ing from "inexorable economic forces"). In view of the Act's spatial deconcentration objective, "the line of causation," 422 U.S. at 509, 95 S.Ct. 2197, between the Secretary's decision and Hartford's injury is a direct one. Moreover, as discussed in the text *infra,* Hartford is asserting a right of its own, one falling within the zone of interests protected by the statute.

14. Professor Davis has cogently argued that the "zone of interest" test "is more verbiage than reality." K. Davis, *Administrative Law of the Seventies* § 22.00, at 486 (1976). He summarizes his reasons for this statement as follows:

[T]he test is contrary to the APA, the Supreme Court itself has not followed it, the test seems unsatisfactory, only two cases have denied standing on the basis of the test to one who is injured in fact, and all federal courts have generally found ways to escape from applying it.

*Id.* § 22.02–11, at 515.

problems facing the City of Hartford." 408 F.Supp. at 894. Thus, contrary to appellants' suggestion, Hartford is not suing on behalf of its citizens as *parens patriae,* but is instead seeking to vindicate interests of its own, which also happen to be, to some extent, congruent with the interests of individual city residents. *See California v. Automobile Manufacturers Association (In re Multidistrict Vehicle Air Pollution M.D.L. No. 31),* 481 F.2d 122, 131 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

### B.   *The Low-Income Plaintiffs*

Like the City, the individual plaintiffs —low-income Hartford residents living in substandard housing, according to affidavits accepted by the district court, 408 F.Supp. at 895 & n.18—must meet both the injury in fact and zone of interests tests in order to have standing to sue. The latter test is easily met here, since the 1974 Act was intended, and the grant funds must be used, to benefit principally "persons of low and moderate income," a phrase repeated throughout 42 U.S.C. § 5301(c) (Supp. V 1975), *see* note 5 *supra.* Moreover, the specific statutory requirement at issue here, the HAP requirement, involves an assessment of, and planning for, "the needs of lower-income persons," both residing in and "expected to reside" in the locality. 42 U.S.C. § 5304(a)(4) (Supp. V 1975); *see* note 6 *supra.* *See also* 42 U.S.C. § 5304(b)(2) (Supp. V 1975) (grant applicant must certify that its program will "give maximum feasible priority to activities which will benefit low- or moderate-income families"). It seems clear that Title I's "zone of interests" encompasses the interests of low-income residents of a central city.

The more difficult issue is whether the individual plaintiffs have been injured in fact by the Secretary's approval of appellants' grant applications. The absence of such injury led to findings that low-income plaintiffs lacked standing in *Warth v. Seldin, supra,* and *Evans v. Lynn, supra.* Because the facts of both cases were quite different from the facts of the instant case,

however, neither is controlling here. In *Warth* the low-income plaintiffs alleged that they had been excluded from a town's housing market by virtue of the town's "exclusionary" zoning ordinance, which they claimed was constitutionally defective. The Supreme Court ruled that the plaintiffs had failed to show that they "personally would benefit in a tangible way from the courts' intervention," 422 U.S. at 508, 95 S.Ct. 2197, in large part because "their inability to reside in [the town] is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts," *id.* at 506, 95 S.Ct. at 2209. Plaintiffs here are asserting a specific violation of a statute, not a generalized claim that a law is unconstitutional, a factor of substantial importance in view of the *Warth* Court's recognition that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" *Id.* at 500, 95 S.Ct. at 2206, *quoting Linda R. S. v. Richard D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). As discussed above, the statute at issue here was designed to protect persons in the plaintiffs' situation, and the approval of applications lacking legitimate "expected to reside" figures in the HAPs appears to have directly injured the plaintiffs, since the HAPs were intended to lead to greater low-income housing opportunities on a deconcentrated, regional basis, *see Hills v. Gautreaux,* 425 U.S. 284, 304– 307 n.21, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). The district court's intervention, moreover, should be of tangible benefit to the plaintiffs, because it is likely to lead to a reallocation of funds to Hartford, *see supra,* which will be required to use the funds for the benefit of persons of low and moderate income, in accordance with the purposes of the Act.

*Evans v. Lynn* is also distinguishable. Although the case has some superficial similarity to the instant case, in that it was an attempt to enjoin HUD's award of federal grant funds on statutory grounds, the en banc majority held that the plaintiffs there failed to demonstrate that they had been

injured by the grant awards or that court intervention would be of benefit to them. *See* 537 F.2d at 595. Beyond that, as Judge Mansfield pointed out in his concurring opinion, if the awards to the New York town in *Evans* had been enjoined, "HUD would presumably [have been] free to use the money to aid construction of sewers and parks in San Francisco." *Id.* at 598. HUD does not have any such freedom in the instant case; the statute gives reallocation priority to "metropolitan area[s] in the same state," 42 U.S.C. § 5306(e) (Supp. V 1975), and HUD's own regulations give priority "to the same metropolitan area," 24 C.F.R. § 570.409(f)(1)(i) (1976). While "[t]he most" the *Evans* plaintiffs could expect was "the satisfaction that federal funds will not be misused," 537 F.2d at 598 (Mansfield, *J.,* concurring), plaintiffs here can expect concrete benefits resulting from both reallocation of community development funds and increased attention to the low-income housing improvement and spatial deconcentration objectives of the Act.[15]

## III. THE ALLEGED VIOLATIONS OF THE ACT

In considering the substance of plaintiffs' allegations that the Housing and Community Development Act was violated by HUD's approval of the challenged grants, we will examine the claim as to East Hartford separately from that as to West Hartford and Glastonbury, because, as indicated *supra,* the latter two towns submitted "expected to reside" figures of zero on their HAPs,

whereas East Hartford submitted an actual number (131).

### A. *West Hartford and Glastonbury*

In submitting grant applications with zero "expected to reside" figures, the two towns were following the option given to them by HUD in the May, 1975, memorandum. The district court held that this option constituted an invalid waiver of a crucial portion of the 1974 Act, so that the appellants in selecting the option, and HUD in approving the grants, all acted contrary to the Act. 408 F.Supp. at 902. HUD now appears to concur in this holding; its amicus brief explicitly declines even partially to contest the district court's conclusion in this regard and assures us that HUD has modified its regulations to bar zero figures submitted because of an alleged unavailability of data. Brief for Secretary of Housing and Urban Development as Amicus Curiae at 16–18.

We agree with the district court and with the HUD amicus brief. The Act itself could not be more clear: no grant may be made unless the applicant submits an application with six elements, one of which is the housing assistance plan, 42 U.S.C. § 5304(a) (Supp. V 1975); the plan must "accurately" assess the housing needs of low-income persons, "residing in or expected to reside in the community," *id.* § 5304(a)(4)(A). *See* note 6 *supra.* Were this the only statutory statement relating to the grant application, it would probably enable us to find that HUD's memorandum

15. The dissent, relying on *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), downplays the congressional emphasis on the "expected to reside" portion of the statute, note 6 *supra,* which is a prerequisite to approval by HUD of a grant application. *See* note 5 of dissenting opinion. But *Linda R. S. v. Richard D.* arose "in the unique context of a challenge to a criminal statute," 410 U.S. at 617, 93 S.Ct. at 1149, and has no relevance to the bearing of "legislative expectations" on standing determinations. The *Linda R. S.* Court expressly distinguished the case before it from a case like the instant one, in which standing derives from the invasion of a statutorily-protected interest. *Id.* at 617 & n. 3, 93 S.Ct. at 1148.

The dissent also refers to *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), using it for the proposition that Hartford bears the burden of proof on the issue of standing. We think that burden met. *Simon is* further cited for the propositions that the injury must be traceable to the challenged actions of the defendants and that the court's remedy must serve to prevent the alleged harm. These accepted propositions can be applied, however, only in the context of the Act of Congress with which this case is concerned; in that context, as our opinion seeks to demonstrate, both requirements have been more than satisfied.

improperly authorized a waiver, for the simple reason that, absent some overriding exigency, an administrative agency may not waive an express statutory requirement. *Cf. Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (agency's decisions must be consistent with governing legislation); *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965) (courts must prevent "the unauthorized assumption by an agency of major policy decisions properly made by Congress"); *Marsano v, Laird,* 412 F.2d 65, 69 (2d Cir. 1969) ("an express statutory right cannot be impaired by administrative action").

The Act does give further guidance, however. In the subsection following the application requirements, it allows the Secretary, in certain circumstances, to waive, or accept the applicant's certification as to five of the six requirements. 42 U.S.C. § 5304(b)(3), (4) (Supp. V 1975). The only requirement not listed is that for the HAP. The conclusion is virtually inescapable that the Secretary lacked discretion to waive the HAP requirement. *See* 408 F.Supp. at 901; text at and notes 7–10 *supra.*

It is true that, as appellants argue, waiver of submission of the "expected to reside" figure is not waiver of the entire HAP requirement. A reading of the whole statute, however, makes it evident that the HAP's value is substantially undermined by omission of this figure. If an applicant makes no effort to predict the number of lower income persons it expects to reside within its boundaries in the near future, it is difficult to see how the applicant can "specif[y] a realistic annual goal" for assisted housing or indicate with any reliability where the proposed housing will be located, both of which it must do in order to complete the HAP. 42 U.S.C. § 5304(a)(4)(B), (C) (Supp. V 1975); *see* note 6 *supra.* In the legislative history of the Act, Congress "emphasize[d]" the importance of communities, "in assessing their housing needs, look[ing] beyond the needs of their residents to those who can be expected to reside in the community as well." H.R.Rep. No. 93–1114, *supra,* at 7. *See also* 408

F.Supp. at 901 ("the 'expected to reside' figure is the keystone to the *spatial deconcentration objective* of the 1974 Act" (emphasis in original)). Because of the central role of the "expected to reside" estimate, we think eminently sound Judge Blumenfeld's conclusion that a waiver of this requirement is in effect a waiver of the entire HAP. *See id.* at 901–02.

Appellants argue in the alternative that the zero figures can be considered legitimate, because the data necessary to make accurate "expected to reside" estimates was not available. The Secretary was thus forced by practical exigencies, they contend, to "defer" this requirement. We believe this argument entirely misunderstands the meaning of a statutory directive. When Congress directs that something be done, it should be done, even if the data base is far from perfect. *Cf. Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159, 1164 (1973) (en banc) (per curiam) (lack of agency experience in area does not "justif[y] a failure to comply with a Congressional mandate"); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 592–95 (1971) (agency must take action even if not convinced "beyond a doubt" as to proper course); L. Tribe, *Channeling Technology Through Law* 33 (1973) (technology assessment frequently amounts to nothing more than "reconciling highly imprecise professional hunches"). Congress was presumably aware of the data collection problems localities might face, *see* H.R.Rep. No. 93–1114, *supra,* at 7, but it apparently preferred an administrative decision based on incomplete data to no decision at all. It is clear that a substantial amount of data was available to the towns; the very HUD memorandum that gave them the zero figure option also listed a variety of data sources from which a reasonable figure could be calculated. Educated guesses by the towns as to how many low-income persons might be expected to reside therein would surely have been better than the sham zero figures in promoting the rational community planning with which Congress was concerned.

## B. *East Hartford*

The Town of East Hartford did submit an "expected to reside" figure, but the district court concluded that HUD's review of this figure's validity was so seriously inadequate as to constitute an abuse of discretion. The figure submitted was based upon a projection of the waiting list of the East Hartford Housing Authority, and HUD failed· to verify in any way whether this figure was a valid one. While HUD sought to justify this failure by asserting an absence of data, HUD's own regulations, application instructions, and memoranda suggested sources of data that were "generally available," 42 U.S.C. § 5304(c)(1) (Supp. V 1975), and that should have been used by HUD to verify the accuracy of East Hartford's figure. Thus, the district court concluded, "HUD was doubly at fault—it did not obtain the generally available information required for a proper review, and it acted upon the basis of inadequate information." 408 F.Supp. at 903.

As the district court recognized, *id.* at 903 & n.57, the general proposition that review of agency discretion is narrowly circumscribed, *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is particularly compelling in the case of review of approval of community development grants, since the statute's application and approval procedures, as discussed *supra,* establish a "presumption of approval." *See also Ulster County Community Action Committee, Inc. v. Koenig,* 402 F.Supp. 986, 990 (S.D.N.Y. 1975); Fishman, *supra,* 7 Urban Law. at 211. As the Supreme Court stated in *Overton Park,* however, such a presumption does not "shield [the Secretary's] action from a thorough, probing, in-depth review." 401 U.S. at 415, 91 S.Ct. at 823, *see Schicke v.*

Romney, 474 F.2d 309, 315 (2d Cir. 1973). This court has plainly held, moreover, that "it is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell,* 460 F.2d 640, 648 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). At the very least, "ascertainable standards" are required. *Holmes v. New York City Housing Authority,* 398 F.2d 262, 265 (2d Cir. 1968).

East Hartford argues on appeal that its "expected to reside" figure of 131 was not proven wrong by the district court. This argument misunderstands the role of the courts in reviewing agency action. The district court did not have an obligation, and perhaps lacked the authority, to assess the correctness of East Hartford's figure. Its role was both more limited and more vital to the proper functioning of the administrative process: to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824.

It seems clear that HUD made a major "error of judgment" in not independently investigating East Hartford's figure. A suburban town's attempt to ascertain the housing needs of future residents from a waiting list for a limited supply of public housing units is certainly sufficiently questionable to require some further verification. The Court below found that data was "generally available" from which such a verification could have been made. Essentially for the reasons stated by the district court, 408 F.Supp. at 902–07, we conclude that the Secretary acted arbitrarily and capriciously in approving East Hartford's grant application.[16]

---

**16.** We recognize and appreciate Professor Davis's concern that review on the basis of "whether there has been a clear error of judgment," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. at 824 (1971), comes too close to judicial substitution of judgment. K. Davis, *supra* note 14, §§ 29.00, 29.-01–5. It is equivalent, Professor Davis urges, to the "clearly erroneous" test, which in turn

involves broader review than even the "substantial evidence" test, *id.* § 29.01–5, at 666, which similarly affords "a considerably more generous judicial review than the 'arbitrary and capricious' test available in the traditional injunctive suit," *Abbott Laboratories v. Gardner,* 387 U.S. 136, 143, 87 S.Ct. 1507, 1513, 18 L.Ed.2d 681 (1967). But it is no substitution of judgment to say that approval of a block grant

## IV. THE REMEDY

The injunction issued by the district court is challenged on the ground that it was directed against appellant towns, rather than against HUD. In view of the fact that HUD had sent letters of credit to the towns by the time the preliminary injunction was issued, so that they were free to obtain grant funds from the Treasury, see *City of Hartford v. Hills, supra*, 408 F.Supp. at 882 (opinion on motion for preliminary injunction), the court's order restraining the towns (who were defendants) from drawing out or spending these funds appears to be the most direct means of preventing expenditure of unlawfully authorized monies. The injunction provided, moreover, that it could "be lifted upon the filing with the court of . . . a new approval [of the towns' grant applications]." 408 F.Supp. at 907. Such an injunction, combining a practical means to a desired end with a mechanism to take account of future developments, is consistent with the broad, flexible nature of the federal courts' equitable powers. See *Hills v. Gautreaux, supra*, 425 U.S. at 296–297, 96 S.Ct. at 1545, 1546, and authorities cited therein.

The suggestion is made that the case may be moot as to West Hartford and Glastonbury because they have filed new applications, the 75-day period has run, and they are entitled to funds under the new applications. See 42 U.S.C. § 5304(f) (Supp. V 1975). But the injunction relates only to funds granted prior to the time of its entry and is not mooted by any later grants pursuant to later submissions. The injunction may be lifted by filing with the district court new HUD approvals of applications with adequate "expected to reside" figures.

Judgment affirmed.

## MESKILL, Circuit Judge (dissenting):

I respectfully dissent, for I cannot agree that the plaintiffs have standing to maintain this action. However, before turning to the issue of standing, I should like to comment upon the unusual procedural posture in which East Hartford, West Hartford and Glastonbury ("appellants") now find themselves. The plaintiffs' complaint originally named HUD, its Secretary, its Regional Administrator and its District Director as the only defendants (the "federal defendants"). The local defendants (Farmington, Windsor Locks, Vernon, Enfield and the appellants) were joined as parties by the federal defendants. At the district court level, the defense of this action, was dominated by the federal defendants, upon whom the local defendants relied to carry the burden of this litigation. This approach was encouraged by the district judge, who, in order to simplify the proceedings, asked the local defendants to "tag along and support the federal defendant [sic] and take the same position." On January 28, 1976, the district court issued its decision enjoining the local defendants from spending the funds granted under the Block Grant Program. The federal defendants decided not to appeal from that decision because (1) HUD finds the *result* to be consistent with its present practices, (2) the district court's opinion can be read in a manner consistent with HUD's interpretation of its duties under the Act, and (3) the injunction only applies to the seven local defendants. Brief For The Secretary of Housing and Urban Development Amicus Curiae at 3. With a few minor exceptions, the brief filed by HUD is in general agreement with the decision of the district court and the position taken by the plaintiffs. The issue of standing is not discussed, for it is outside the scope of the brief. *Id.* at 4.

Of the seven local defendants thus left holding the bag, three have appealed. All have now learned the hard way that it is not always a good idea to "tag along" with and "take the same position" as a co-defendant. The three appellants are now represented by counsel who did not participate in any of the proceedings below.

---

under the Act must depend upon agency consideration of *all* the data that the agency itself thinks relevant to the statutory requirement of an "expected to reside" estimate. See K. Davis, *supra* § 29.01–5, at 666 (approving *Overton Park's* "consideration of relevant factors" test).

It is relatively easy to see why all of this occurred. HUD of course, has a substantial interest in the manner in which the courts construe the 1974 Act, and so it would naturally want to play a dominant role in any proceeding concerning that Act. The local defendants who were joined as such by HUD would naturally want to rely heavily upon the latter's expertise. This is particularly true where, as here, the district court asks them to do so in order to simplify the proceedings. As a result of what has occurred, however, much has been lost in terms of the sharpening of the presentation of issues upon which the courts rely so heavily. It is not my intention to disparage counsel's presentation, for counsel have, in my judgment, done a fine job in that regard. I wish only to point out that it could have been improved if greater foresight had been shown at the district court level. District courts and private counsel can, and should, be alert to the potentially conflicting interests of private litigants and governmental agencies, but governmental agencies bear a special responsibility in this respect. Because of their expertise in their respective fields, and because of the frequency with which they are likely to encounter problems such as that which has arisen here, governmental agencies are in a superior position to foresee and avert those problems. It is to be hoped that in the future agencies such as HUD will make some effort to assure that their co-defendants are made aware of possible conflicts of interest so that other litigants will not find themselves in appellants' position.

Turning now to the standing issues presented, I believe a brief restatement of the facts is in order. On April 15, 1976, the Hartford Area Office of the Department of Housing and Urban Development received an application for Community Development Block Grant Assistance filed by the City of Hartford pursuant to the Housing and Community Development Act of 1974. By letter dated June 24, 1975, HUD approved a grant to Hartford in the amount of $10,-025,000. Hartford executed a Grant Agreement on July 30, 1975.

The towns of East Hartford, West Hartford and Glastonbury followed much the same procedure in applying for Block Grant Assistance, and they were granted $440,000, $999,000 and $910,000, respectively. Hartford and two of its low-income residents now challenge those grants on the ground that the applications submitted by the towns fail to satisfy one of the requirements of the Act.[1] The majority holds that the plaintiffs have standing to make such a challenge. I cannot agree.

The majority holds that Hartford has satisfied the "injury in fact" test established in *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187 (1970), because (1) if the grants to the towns are disapproved, there is a "strong likelihood," *ante,* at 1038 that Hartford will receive reallocated funds under 42 U.S.C. § 5306(e) (Supp. V 1975),[2] and (2) HUD's approval of applications that failed to comply with the statutory requirements "substantially less-

1. Of the eight municipal governments, including the City of Hartford, who were parties to this action, only one, East Hartford, made any attempt to satisfy the requirement of 42 U.S.C. § 5304(a)(4)(A) (Supp. V 1975). Thus, Hartford and six of the defendant towns entered zero as the number of low-income persons "expected to reside" within their borders. East Hartford entered 135. HUD subsequently reduced this figure to 131.

2. The complaint does not mention the possibility of obtaining reallocated funds as a prospective benefit of this lawsuit. To find that the plaintiffs have alleged a stake in the outcome sufficient to confer standing on the basis of a prospective benefit that is not even mentioned

in the complaint is to grant far greater pleading latitude than prior cases indicate is appropriate. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37–46, 96 S.Ct. 1917, 1924–28, 48 L.Ed.2d 450, 460–465 (1976); *Warth v. Seldin,* 422 U.S. 490, 501–02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734–36, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Evans v. Lynn,* 537 F.2d 571, 592 (2d Cir. 1976) (*en banc*) cert. denied, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). *See also* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction § 3531, at 17–18 (Supp. 1976).

en[ed] the probability," *ante*, at 1039, that Hartford would benefit from the "spatial deconcentration" objective of the Act.

Assuming, arguendo, that a potential claim to a fund that will not even exist unless plaintiff is successful on the merits can ever satisfy the injury-in-fact test—which appears to require a present injury in addition to a prospective benefit—it is clear that in this case there is not the slightest chance that Hartford will ever receive reallocated funds as a result of this lawsuit. While it may be true that Hartford would have a priority position in applying for reallocated funds, that priority will mean little if there are no funds to reallocate. Despite the indications to the contrary in the majority opinion, Hartford, as the party who asks the Court to assume jurisdiction, bears the burden of proof on the issue of standing *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450, 464 (1976), and although Hartford may have proved that it would have a priority position in applying for reallocated funds, it has failed to prove that the intervention of the federal courts will result in the availability of funds for reallocation. The wrong of which Hartford complains is HUD's approval of the defendant towns' allegedly defective applications. If Hartford is correct that the applications were defective, and that HUD abused its discretion in approving them, Hartford would not be entitled to relief preventing the defendant towns from ever receiving their grants. Hartford would be entitled only to an injunction pending the submission of acceptable applications—precisely what it sought, and precisely what the district court granted. Such an injunction would result in the availability of funds for reallocation only if the towns forfeited their grants by failing to submit acceptable applications. West Hartford and Glastonbury have already submitted new applications, thereby negating any possible inference that they intend to forfeit their grants—in addition to creating a substantial mootness problem—and there is not the slightest indi-

cation that East Hartford has any intention of forfeiting its $440,000 grant by failing to do likewise. It is sheer fantasy to suppose that Hartford will ever receive reallocated funds as a result of the intervention of the federal courts. In my view, Hartford's asserted interest in reallocated funds is even more speculative than the interest found to be not judicially cognizable in *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), and, accordingly, I would hold that it is insufficient to confer standing upon Hartford.[3]

The majority also finds standing on the basis of "a second, less quantifiable," injury suffered by Hartford, *ante*, at 1038. That injury is the "bleak" housing situation that exists in Hartford. That situation will be improved, we are told, if the suburbs are required to include accurate "expected to reside" figures in their applications for Block Grants. This injury is insufficient to confer standing for three reasons. First, it cannot fairly be said that the housing situation in Hartford is a result of, or can be traced to, the challenged action of the defendants. *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 41, 96 S.Ct. 1917, at 1926. Second, the possibility that the inclusion of accurate "expected to reside" figures will result in the betterment of the housing condition in Hartford is at least as remote and speculative as the possibility in *Linda R. S. v. Richard D., supra,* that the prosecution of an unwed father for failing to support his child will result in the payment of support. Third, and more important, Hartford may not properly assert an interest in improving its bleak housing situation in an action against the federal government. The doctrine of *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), places strict limits on the power of states to represent their citizens in actions against the federal government. *See, e.g., Com. of Pa., by Shapp v. Kleppe,* 174 U.S.App.D.C. 441, 533 F.2d 668, *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976). The

---

**3.** To the extent that the low-income plaintiffs' claim of standing rests upon their assertion of

an interest in reallocated funds, *see ante*, at 1038, it too must fail.

power of a political subdivision of a state is even more rigidly circumscribed. As the majority recognizes, *ante*, at 1040, a city cannot sue as *parens patriae*, but is limited to the vindication of such of its own proprietary rights as might be congruent with the interests of its residents. *California v. Auto. Mfrs. Ass'n, Inc. (In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31)*, 481 F.2d 122, 131 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). Hartford's assertion of an interest in improving its bleak housing situation is nothing more than an attempt to vindicate a general interest in the social and economic well-being of the citizenry. Even a state would encounter serious difficulties in asserting such an interest against the federal government, and it can hardly be said that this is the sort of proprietary interest which Hartford may assert.

Merely because Hartford may not assert the rights of its citizenry in a representative capacity does not mean that individual citizens may not assert their own rights. Accordingly, I next turn to the claims of the low-income plaintiffs to determine whether they have alleged a stake in the outcome sufficient to confer standing.

The individual plaintiffs in this case are low-income residents of Hartford who live in substandard housing and who have sought, unsuccessfully, to secure affordable housing in the suburbs. There is, of course, no question that an individual who is, effectively, trapped in a slum suffers a serious, present and continuing injury. Abstract injury alone, however, is insufficient to confer standing. *Linda R. S. v. Richard D., supra*, 410 U.S. at 618, 93 S.Ct. at 1149. The injury alleged must fairly be traceable to the challenged action of the defendant, and the desired exercise of the Court's remedial powers must in some perceptible way serve to remove the harm. *Simon v. Eastern Kentucky Welfare Rights Organization, supra*, 426 U.S. at 40–46, 96 S.Ct. at 1925–1928. The majority is correct in holding that the facts of this case are distin-

guishable from those of *Warth* and *Evans*.[4] However, the distinctions are not great enough in my judgment, to justify the conclusion reached by the majority.

To begin with, the bleak housing situation in Hartford is not the product of HUD's failure to require the defendant towns to include "expected to reside" figures in their applications for Block Grants under the 1974 Act. The housing situation in Hartford was bleak long before 1974. Nor are the specific conditions of which the plaintiffs complain a product of HUD's alleged abuse of discretion. Plaintiff Jordan had been living at her present address for two years as of June 30, 1975, and therefore her plight antedates the Act by roughly one year. Plaintiff Mauldin's position is no stronger. She moved to Hartford approximately one month before David Meeker wrote his memorandum "waiving" the requirement of 42 U.S.C. § 5304(a)(4)(A) (Supp. V 1975). Of course, Mrs. Mauldin's plight has nothing to do with acts of Congress or HUD or David Meeker's memorandum. Her plight is the direct result of the fact that her husband became incapacitated. That incapacitation led to his unemployment, which, in turn, led to the loss, through foreclosure, of the family home in the suburban town of Bloomfield.

As indicated above, the injury suffered by the individual plaintiffs is a continuing one. However, because the basic injury of which the plaintiffs complain antedated the action they challenge, they would have standing only if they can allege that their injury has been, or will in fact be perceptibly aggravated by the challenged action. The plaintiffs have not made, and, indeed, could not make, such an allegation. HUD's failure to require the defendant towns to include "expected to reside" figures in their applications for Block Grants did not make the plaintiffs' situation worse, but merely left it the same. The "waiver" of the requirement by HUD did not have a negative effect. It merely failed to produce the hoped-for positive effect. Thus, the low-in-

---

4. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197 (1975); *Evans v. Lynn*, 537 F.2d 571 (2d Cir. 1976) (*en banc*), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977).

come plaintiffs' claim of standing, like that of the City of Hartford, depends not upon a present injury that has been caused by HUD's allegedly unlawful action, but upon a prospective benefit that they hope will accrue if the federal courts intervene and require the inclusion of accurate "expected to reside" figures. The standing *vel non* of plaintiffs with such claims depends upon whether there is a direct nexus between the vindication of their interests and the relief they seek, or whether the prospect that their lot will be improved by the desired exercise of the Court's remedial powers is merely speculative. *See Linda R. S. v. Richard D., supra,* 410 U.S. at 618–19, 93 S.Ct. 1149. The most recent applications of these standards by the Supreme Court place formidable barriers in the way of actions such as the one now before this Court. *See, e.g., Simon v. Eastern Kentucky Welfare Rights Organization, supra.* The plaintiffs have not, in my view, successfully cleared those barriers. It is naive to imagine that plaintiffs' lot will be perceptibly improved merely by coercing the defendant towns into including accurate "expected to reside" figures in their Block Grant applications. The "expected to reside" figure lacks the magical power that would be required to produce such a result. The causes of the housing problems that plague the cities of this Nation are legion. Suggested cures for those problems are complex and equally numerous. The "expected to reside" figure is a new and relatively small part of the federal government's attack on urban housing problems. Its impact on those problems is unknown and unmeasurable. The prospect that it will have the desired impact or that its impact will be perceptible is gossamery.[5] Thus, the complaint does not demonstrate, and the plaintiffs could not possibly show, a substantial likelihood that victory in this suit would result in their securing the adequate, low-cost housing that they desire. *See, Simon v. Eastern Kentucky Welfare Rights Organization, su-*

*pra,* 426 U.S. at 44–46, 96 S.Ct. at 1927. Accordingly, I would hold that the low-income plaintiffs, like the City of Hartford, lack standing to maintain this action.

The judgment of the district court should be vacated and the cause remanded with instructions to dismiss the complaint.

## ON REHEARING EN BANC

, · Before KAUFMAN, Chief Judge, and SMITH, FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

Appeal from a judgment of the United States District Court for the District of Connecticut, M. Joseph Blumenfeld, Judge, 408 F.Supp. 889 (D.Conn.1976), enjoining appellants from spending federal funds granted to them under Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.,* pending their compliance with one of the requirements of that Act. A divided panel of this Court affirmed. On rehearing *en banc,* the Court of Appeals reversed and remanded with instructions to dismiss the complaint on the ground that the appellees lacked standing.

Judgment reversed and remanded.

MESKILL, Circuit Judge:

The United States District Court for the District of Connecticut, M. Joseph Blumenfeld, Judge, held that the City of Hartford and two of its low-income residents have standing to challenge the propriety of the Department of Housing and Urban Development's ("HUD") approval of federal grants-in-aid to seven suburban communities in the Hartford area. On the merits, the District Court held that HUD had acted unlawfully in approving the grants. The communities were enjoined from drawing upon the Treasury or spending their funds pending the submission of lawful applica-

---

**5.** It is true, of course, that Congress expects, or at least hopes, that the "expected to reside" figure will have some impact. However, legislative expectations are not necessarily disposi-

tive in determining whether those expectations are speculative. *See Linda R. S. v. Richard D., supra.*

tions. 408 F.Supp. 889 (D.Conn.1976). Three of the suburban communities appealed, and on December 23, 1976, a divided panel of this Court affirmed. The appellants petitioned for a rehearing *en banc.* It was urged that the jurisdictional issue was one of exceptional importance because it involves the standing of a municipality and its residents to challenge federal grants to a separate municipality. It was also urged that a rehearing *en banc* was necessary in order to secure uniformity of our decisions. A majority of the active judges agreed, and pursuant to Fed.R.App.P. 35(a) a rehearing was ordered on February 8, 1977. The appeal was submitted without further oral argument. We reverse the judgment of the district court, and remand the case with instructions to dismiss the complaint.

## I.

The material facts of this dispute have been set forth in the opinions of the panel majority and dissent. Except for a further explanation of the nature of the so-called "expected to reside figure"—which is essential to an understanding of the issue of standing—the facts of this case will not be repeated here.

In order to obtain assistance under the Community Development Block Grant program created by Title I of the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.* ("1974 Act"), a town must submit an application to the Secretary of Housing and Urban Development. That application must include, among other things, a "housing assistance plan." According to HUD's general instructions for the completion of the Housing Assistance Plan forms:

> The Housing Assistance Plan section of the Community Development Block Grant application consists of four forms and a map, with narrative explanations, showing, respectively: I. Survey of Housing Conditions; II. Housing Assistance Needs of Lower Income Households; III. Annual Goal for Housing Assistance; and

IV. General Locations for Lower Income Housing.

Form II is designed to satisfy the community's obligation to "accurately . . . [assess] the housing assistance needs of lower-income persons . . . in the community." 42 U.S.C. § 5304(a)(4)(A). That assessment must account for low-income persons who (1) actually reside in the community, (2) are displaced or are to be displaced, or (3) are expected to reside in the community. *Id.* The "expected to reside figure" at issue in this case represents the number of persons in this third category. Put another way, the expected to reside figure is a relatively small part of a very large application.

The expected to reside figure is merely an educated guess at the number of people who are going to move into the community. HUD's regulations refer to it as an "estimate." 24 C.F.R. § 570.303(c)(2). During 1975, the first year in which the Act was in effect, it became clear that accurate predictions of the future would not be easy to make. The methodologies used by many communities were unsophisticated, and it was difficult to obtain reliable data. These difficulties eventually led HUD to waive the requirement of an expected to reside figure, on the condition that towns indicate on their applications what steps they planned to take in 1976 to arrive at acceptable estimates. The requirement was not waived in later years, and current regulations give applicants considerably more guidance than did those in effect in 1975. Nevertheless, the expected to reside figure remains a guess, albeit a better educated one.

A community's estimate of the number of low-income persons expected to reside within its borders has never been a self-fulfilling prophecy. The figure entered on a community's application does not alter its future population, but merely predicts it. It is theoretically possible for an expected to reside figure to influence the future availability of low-income housing in a given community, because federal housing as-

sistance subsidies [1] are allocated to communities based in part on the anticipated needs reflected in their housing assistance plans. *See* Title II of the Housing and Community Development Act of 1974, § 213(d)(1), 42 U.S.C. § 1439(d)(1). In this case, however, the housing assistance plans submitted by the defendant towns fully utilized all available Title II funds. Therefore, even if the seven defendant communities had revised their expected to reside figures upward, no additional housing subsidies would have been obtained, because no additional funds were available.

With this background, we turn to the issue of standing.

## II.

■ The plaintiffs in this action challenged the legality of HUD's waiver of the expected to reside requirement. It is our task to determine whether they have standing to make such a challenge. The applicable standards are clear:

> The essence of the standing question, in its constitutional dimension, "is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." . . . The plaintiff must show that he himself is injured by the challenged action of the defendant. The injury may be indirect . . . but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions.

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 260, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977) (citations omitted). Furthermore, the plaintiff's injury must be one which is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917,

1924, 48 L.Ed.2d 450 (1976). In other words, a plaintiff must show injury; he must trace it to the defendant's allegedly unlawful acts; and he must show that the remedy he seeks is likely to redress his injury.

Our analysis of this case begins with an examination of the injury alleged by the plaintiffs. The 1974 Act, it is claimed, was intended to benefit the plaintiffs in various ways. Specifically, it is designed to eliminate urban blight and create viable urban communities. 42 U.S.C. § 5301(c). It is also designed to reduce "the isolation of income groups within communities and geographical areas" and to increase "the diversity and vitality of neighborhoods." 42 U.S.C. § 5301(c)(6). These latter objectives are to be achieved by means of "the spatial deconcentration of housing opportunities for persons of lower income" and by means of "attract[ing] persons of higher income." *Id.* Plaintiffs allege that the Act is designed to encourage the wealthy to return to the cities and to facilitate the movement of the poor into the suburbs.[2]

The plaintiffs claim that the defendants' unlawful acts—the submission and approval of applications without expected to reside figures—caused them injury because it made them less likely to benefit from the 1974 Act. This is said to injure both Hartford, which must bear the heavy burden of caring for its low-income residents, and the low-income residents themselves, who cannot find adequate housing in the suburbs. These claims will not withstand scrutiny.

Assuming *arguendo* that the plaintiffs have a legitimate, judicially cognizable expectancy interest in the benefits that should accrue to them under the Act, it is impossible to know whether the lack of expected to reside figures on the first year applications submitted by the defendant towns had, or will have, any detrimental effect on that interest.

---

1. Community development grants may not be used for housing.

2. We accept this interpretation only for purposes of discussion. It is by no means clear

whether Congress sought to encourage *inter*-city spatial deconcentration or *intra*-city spatial deconcentration or both.

■ If this were an appeal from a judgment granting the defendants' motion to dismiss for lack of standing, we would be required to accept as true all of the material allegations of the complaint. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, we are reviewing a final judgment based on a fully developed record, and the issue of standing is one on which the plaintiffs bear the burden of proof. *See Simon v. Eastern Kentucky Welfare Rights Organization, supra,* 426 U.S. at 45, 96 S.Ct. at 1927. In this context, plaintiffs have either proved a "specific and perceptible harm," *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), or they have not. Here, they have not. It is theoretically possible that a failure to comply with *any* requirement in the Act will have a negative effect on the plaintiffs' expectancy interest. In order to have standing, however, the plaintiffs must show more than a theoretical possibly:

> A plaintiff must [prove] that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action.

*United States v. SCRAP, supra,* 412 U.S. at 688–89, 93 S.Ct. at 2416. Here, it is probable that the lack of compliance with the Act did not affect plaintiffs at all. The defendant towns' housing assistance plans have fully utilized all of the funds available for low-income housing subsidies under Title II of the Act. Because the only effect of the expected to reside figure is indirect—via Title II subsidies—and because no additional Title II subsidies are available, it is unlikely that the lack of expected to reside figures had any effect on the interests of the plaintiffs.

Moreover, it is speculative whether the relief sought by the plaintiffs—an injunction against the use of Title I funds pending the submission of applications complying with the Act—will redress their alleged

injury. The only evidence in the record indicating the probable effect of increased expected to reside figures is contained in an affidavit from Lawrence L. Thompson, the Area Director of the Hartford Area Office of HUD. According to his affidavit, an upward revision of the defendant towns' expected to reside figures could not make additional housing subsidies available. Consequently, the prospect that the submission of accurate expected to reside figures sought by the plaintiffs will have a positive effect on the plaintiffs' expectancy interest is at best speculative.

The expected to reside figure is not a goal for the future which communities are required to satisfy, but merely a prediction of what is going to happen. It is a device used to plan for future population changes, not a device for achieving them. A modification of the expected to reside figure would have no greater impact on the number of future residents than a modification of tomorrow's weather forecast would have on tomorrow's weather.

Much has been made in this case of the fact that if the defendant communities fail, or refuse to comply with the Act, their grants will be reallocated. This, it is claimed, will lead to the possibility that the plaintiffs would benefit from the reallocation of funds. This theory also is inadequate to support standing in the instant case. The relief sought and obtained by the plaintiffs left the defendants two choices: they could revise their figures and receive their grants, or they could refuse to comply and forfeit their grants. Inasmuch as the first alternative would produce no benefit for plaintiffs, it is immaterial whether they might benefit from the second—at least absent a "substantial probability" that the second alternative will in fact be chosen. *Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. 2197. Here, there was not the slightest showing that any of the defendant towns would choose to forfeit their grants rather than modify their applications.[3]

3. We learn from events which have occurred after the district court rendered its decision that five of the original seven defendant towns

have already revised their expected to reside figures and their applications now meet the approval of both HUD and the plaintiffs. Of

Thus, we conclude that the plaintiffs have failed to trace their alleged injury to the allegedly unlawful conduct of the defendants, and they have failed to demonstrate that the relief they seek would serve to redress that injury.

Accordingly, the judgment of the district court is reversed, and the cause is remanded with instructions to dismiss the complaint on the ground that the appellees lack standing.

IRVING R. KAUFMAN, Chief Judge (concurring):

I had occasion, earlier this Term, to compare some of the laws we are called upon to interpret to King Minos's labyrinth in ancient Crete, *Lok v. I.N.S.*, 548 F.2d 37, 38 (2d Cir. 1977). Surely this is another case in point. Judge Oakes in his opinion for the panel found the "expected to reside" estimate the lynchpin of the statutory scheme, and the principal means by which the legislative objective of spatial deconcentration of low-income housing may be achieved. *Hartford v. Glastonbury*, 561 F.2d 1032, 1035–1036 (2d Cir. 1976). The majority, in contrast, characterizes it as merely "a relatively very small part of a very large application", *supra* at 1049. The facts before us do not require a choice between these two radically different views of the statutory pattern. Nor do I understand the majority's decision to be based on its evaluation of the importance of the "expected to reside" figure. I would, therefore, reverse without intimating any view concerning the general legislative pattern. At best an eagerness to characterize the statute will be

treated as *obiter dictum* in future cases; at worst, we risk prejudging situations yet unforeseen.

The test we must apply to measure standing is a deceptively simple one: is there a substantial likelihood that the City of Hartford or the individual appellees will benefit personally from the injunction they seek? *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The decree entered by the district court afforded the suburban towns two options: to submit a revised application for a community development grant, including a realistic "expected to reside estimate," or to forego HUD funds for FY 1975. I believe that where, as here, the relief sought permits the defendant two entirely practical options, *Simon* requires the plaintiff to demonstrate a substantial probability of benefit regardless of which course of action the defendant elects.

The appellees' principal objective in commencing this lawsuit was, of course, to compel the suburban towns to comply with the law. Hartford maintains that it will receive the very benefit Congress intended if the suburban towns successfully reapply for community development grants: relief from the burden flowing from concentration of low income people, all too often members of minorities, in the central city.

Considered abstractly, this argument has appeal. In our system of coordinate powers, the courts must ordinarily respect legislative judgments concerning the efficacy of statutes. *See Katzenbach v. Morgan*, 384 U.S. 641, 652–56, 86 S.Ct. 1717, 16 L.Ed.2d

the appellants, only East Hartford has not yet submitted a revised figure. East Hartford's failure to do so is consistent with its position that the figure of 131 included on its application was in fact correct. It has been suggested that East Hartford may be barred from revising its figure as a result of its failure to comply with a deadline for resubmission set by HUD after the district court's decree was entered. We need not consider what would happen if HUD, as one of the defendants in this action, sought, by means of such a deadline, to prevent East Hartford from following an order of the district court to comply with the 1974 Act. We have no doubt that HUD would be happy to

permit East Hartford to correct its application, particularly if the Court held that the Act so required. In any event, the plaintiffs' standing must be judged as of the time this action was commenced. At that time, the prospect that East Hartford would forfeit its grant was even more remote than it is now. Events occurring after the filing of the complaint cannot operate so as to create standing where none previously existed. Any other rule would permit lawsuits to be maintained in the mere hope that the lawsuit itself would generate a constitutional "controversy" before the appellate process is complete.

828 (1966); Cox, *The Role of Congress in Constitutional Determinations*, 40 U. Cincinnati L.Rev. 199 (1971). Any other policy would require the judiciary to indulge in an independent assessment of the wisdom of Congressional action. To declare a duty prescribed by Congress too "speculative" to be enforced by an aggrieved litigant is tantamount to saying it shall not be enforced at all. Therefore, although there should not be blind deference to legislatures, *see Linda R. S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) (involving "special status of criminal prosecutions in our system"), I would be exceedingly loathe to label "speculative" a chain of causation that, on the appellees' interpretation of the applicable law, Congress must have considered plausible.

Under the unusual circumstances presented here, however, it is not necessary to question congressional factfinding to conclude that neither Hartford nor the individual appellees would benefit from compelling the suburbs to comply with the Act in 1975. I must emphasize that the action of HUD challenged in this suit is extremely limited. HUD did not permanently waive the "expected to reside" requirement, but rather approved *first year* applications without the needed figures.[1] Accordingly, general statements that the "expected to reside" figure is critical to achieving the overall statutory purpose of promoting deconcentration of low-income housing are beside the point: the essential issue is whether Hartford will benefit from the desired revision of the suburbs' FY 1975 application for community development funds. It is impossible to show that *any* housing units are likely to be built as a result of the Towns' eventual compliance with the "expected to reside requirement" in their FY 1975 application. Indeed, since the suburbs received the maximum available subsidies for low and moderate income housing that year, it is inconceivable that submitting an adequate "expected to reside" estimate could have any effect on deconcentration of housing for the poor in the Hartford metropolitan area.

A great deal has been made of the possibility that the City of Hartford will be near the front of the queue for funds available for reallocation as a result of East Hartford's failure to reapply. But, as Judge Meskill points out, standing cannot be established by hindsight. It must be assessed at the outset of a lawsuit. *See, The Supreme Court*, 1975 Term, 90 Harv.L.Rev. 56, 210 (1976). It would be absurd—and wasteful—to permit litigation to be maintained in the mere hope that "a constitutional 'controversy' [will emerge] before the appellate process is complete." *Supra* at 1051–1052, n. 3. Accordingly, I believe that a plaintiff must demonstrate a likelihood of benefit wholly apart from a defendant's response to the district court's decree. Where, as here, compliance with the conditions sought in the lower court's order would be of no tangible value to the plaintiffs, the possibility that the defendants will fail to comply does not justify proceeding with the lawsuit. Thus, I do not believe that the mere chance Hartford will receive a portion of the $440,000 available for reallocation as a result of East Hartford's refusal to reapply for a community development grant for FY 1975—a chance that seems minimal in any event—would suffice

---

1. The dissent asserts surprisingly, "Had the plaintiffs not filed suit, . . . HUD might well have continued its 1975 policy for a period stretching into the indefinite future." *Infra* at 1055. But HUD's policy in years subsequent to 1975 is not at issue in this lawsuit. No one until now has ever questioned HUD's determination to require the expected-to-reside estimate as soon as an appropriate method of calculation was devised, and there is no evidence before us that HUD even considered its suspension of the requirement past fiscal 1975.

In view of the insistence in the dissenting opinion on a precise formulation of the interest at stake in this lawsuit, I find Judge Oakes's broad formulation particularly troubling. It is impossible to avoid making standing doctrine more confusing than it already is if every case is seen as posing, in the most general terms, a mortal challenge to judicial review of administrative action. It is possible for standing cases to be of less than earthshaking importance. I believe the issues unnecessarily raised by both the plurality opinion and the dissent should be left for another day.

to confer standing on Hartford or its low-income residents.

OAKES, Circuit Judge (dissenting), with whom Judges SMITH, FEINBERG and GURFEIN concur:

The anomalies in this case might cause a lay observer to question the rationality of the judicial process. Plaintiffs' principal purpose in bringing suit was to stop a federal agency (HUD) from violating the law (the Housing and Community Development Act of 1974 or HCDA) in a manner adverse to plaintiffs' interests. Following a district court ruling that HUD had indeed violated the law, the agency did not appeal; instead, it revised its regulations (for fiscal years after 1975) to meet the plaintiffs' objections. Having achieved this goal by virtue of bringing suit, plaintiffs now are told by the en banc majority that they lacked a sufficient interest in the outcome at the time they filed the suit and hence that they lacked standing to sue. This holding becomes particularly anomalous when one considers that, as Judge Meskill's plurality opinion recognizes, at 1051 n. 3, it is more likely today than when the suit was initiated that Hartford, had it been successful on the standing issue, would have received reallocated fiscal year 1975 funds as the result of the suit it brought. In view of what has actually occurred as a result of the suit, the majority's conclusion that no cognizable interest existed at the suit's outset requires at the very least careful scrutiny.

I believe that both the plurality opinion and Chief Judge Kaufman's concurring opinion misconceive the nature of this suit. They also fail to appreciate the underlying purpose of the statute under which the suit was brought. But more important, perhaps, they read into the law of standing a test far more restrictive than any devised by the Supreme Court, a test that could threaten the viability of all litigation aimed at illegal agency action. In an area of the law that many commentators have decried as confused, see, e. g., K. Davis, *Administrative Law Text* § 22.01 (3d ed. 1972); Albert,

*Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief*, 83 Yale L.J. 425, 425 n. 1 (1974); Lewis, *Constitutional Rights and the Misuse of "Standing,"* 14 Stan.L.Rev. 433, 434 (1962); Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv.L. Rev. 645, 645 n. 1 (1973), and that Professor Paul Freund has called "among the most amorphous in the entire domain of public law," *Hearings on S. 2097 Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary*, 89th Cong., 2d Sess., pt. 2, at 498 (1966), the two opinions of the en banc majority have succeeded only in further muddying the waters. Accordingly, I dissent.

## I.

### The Nature of the Suit

The way in which a suit is characterized has much to do with whether plaintiffs are deemed to have standing. If the purpose of the suit is misperceived, the interest of the plaintiffs is likely to be misconceived, since the latter turns on the former and the former shapes the latter. Here the majority fails to examine the suit's principal purpose and, as a result, misunderstands the nature of the plaintiffs' interest.

The majority views this suit as if its principal purpose were to prevent the defendant towns from receiving fiscal 1975 grants under the HCDA. They rely on the fact that the towns had an option under the injunction ultimately issued by the court below, an option of revising their Housing Assistant Plans (HAPs) with regard to the expected-to-reside (ETR) figures, thereby qualifying to seek dissolution of the injunction and release of the grant funds originally sought. On this basis the majority concludes that the plaintiffs could not have had a substantial probability of benefiting from the suit. But the suit was not brought to prevent the defendant towns from receiving grant monies, nor was it brought to obtain revision of one particular year's ETR figures for these towns. Rather, it was brought with the goal of halting the violation by HUD, a federal administrative

agency, of the HCDA, an Act of Congress that the agency was charged with enforcing for the benefit of cities like Hartford.

HUD officials were initially the only defendants named in the complaint, which alleged that they had failed to meet their obligations under the HCDA. Because, at the time the suit was filed, HUD had already issued letters of credit to the towns whose grants were being challenged, HUD and the towns moved to join the towns as defendants, and the district court granted the motions, see *City of Hartford v. Hills*, 408 F.Supp. 879, 882 (D.Conn.1975) (opinion granting preliminary injunction). But the entry of the towns, while necessary to ensure an adequate remedy, did not change the nature of the suit as one aimed at violation of law by a federal agency. While the towns may have had the option on which the plurality and concurring opinions put such emphasis—that of revising their HAPs rather than forfeiting grant funds— HUD had no options; it had to enforce the statute as written. That it was not doing so at the time the suit was filed is clear from its failure to appeal and its adoption of explicit ETR regulations for post-1975 grants, 24 C.F.R. § 570.303(c)(2)(i) and (ii) (1976); *see* 41 Fed.Reg. 11128 (1976), as well as from Judge Blumenfeld's ruling below, upheld by the panel majority.[1] Had the plaintiffs not filed suit, all indications are that 1975 grants would have been disbursed illegally to the towns; moreover, HUD might well have continued its 1975 policy for a period stretching into the indefinite future. It was these abuses that plaintiffs, particularly the City of Hartford, sought to prevent by filing suit, and it is with this purpose in mind that any analysis of plaintiffs' interest in the suit must proceed.

1. The en banc majority does not, of course, reach the merits, as it finds a lack of standing. This opinion will not comment further on the merits, which are analyzed in the panel majority opinion, *ante*.

2. I am puzzled by the concurring opinion's attempt to "reverse without intimating any view concerning the general legislative pattern." *Ante*, at 1052. The essence of Hartford's claim here is that it was deprived of legal rights that

## II.

### *The Statute and the City of Hartford*

Once it is accepted that the plaintiffs' principal objective in filing suit was to secure compliance by HUD with the law, analysis begins with the question why the plaintiffs cared about this objective. The panel majority opinion answers this question in some detail as to both the City and the low-income plaintiffs. I will not repeat that analysis here, but further examination of the interest of the City in particular is necessary in light of the en banc plurality and concurring opinions. To understand how Hartford would benefit from HUD insistence on adequate HAPs from Hartford's suburbs, one must first understand both the nature of the City of Hartford and the structure of the HCDA.[2]

Based on uncontested affidavits and testimony, the district court found that "Hartford is one of the American central cities, suffering from a concentration of lower-income persons . . . ." *City of Hartford v. Hills*, 408 F.Supp. 889, 893 n. 14 (D.Conn. 1976) (opinion granting permanent injunction). The court noted *inter alia* the large number (over 50%) of Hartford residents receiving government assistance, the high unemployment rate in the city (13.6%), and the high minority population (35.5% overall; 80% of the school population). *Id.* The court characterized "[t]he housing situation in Hartford [as] bleak", basing this assessment on the large number of "substandard, deteriorating or dilapidated units" and on the "critical housing shortage in the City, resulting in severe overcrowding." *Id.* at 893–94 n. 14. Comparing the condition of Hartford in these respects to that of its

were created by the HCDA, as discussed *infra*. The allegation of such a deprivation confers standing on the injured party. *Warth v. Seldin*, 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). One cannot determine what rights Hartford had under the HCDA without careful examination of "the general legislative pattern."

suburban towns, the court found a "marked contrast." *Id.* at 894 n. 14. Since these findings are not in any way challenged here, no more need be said about the characteristics and problems of the City of Hartford; one doubts if the staid prose of an appellate opinion could accurately portray them in any event.

The HCDA and its legislative history leave little doubt that the Act was designed to assist cities in the precise position in which Hartford finds itself. The Act begins with a congressional finding that urban problems arise from, *inter alia*, "the concentration of persons of lower income in central cities". 42 U.S.C. § 5301(a)(1) (Supp. V 1975). The "primary objective" of the Act—not some collateral purpose—is declared to be "the development of viable urban communities," with "specific objectives" including "the elimination of slums and blight" and of "conditions which are detrimental to health, safety, and public welfare" and "the reduction of the isolation of income groups within communities and *geographical areas* . . . through the spatial deconcentration of housing opportunities for persons of lower income." *Id.* § 5301(c) (emphasis added). These declarations leave very little doubt about congressional intent, and the legislative history reinforces the conclusion that the design of the Act was to assist cities like Hartford. The Senate Report notes Congress's desire "to insure that Federal funds . . . be used with a priority to eliminate slums and blight and to upgrade and make the Nation's cities more livable, attractive and viable places in which to live." S.Rep. No. 93–693, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Admin. News pp. 4273, 4274. The Report also emphasizes the

importance of "urban-suburban cooperation on housing and renewal". *Id.* at 4320.[3]

There is thus little question that the HCDA in general was designed to assist cities like Hartford. Within the HCDA framework, moreover, the ETR estimate required in the HAP plays a crucial role. Community development grants cannot be made by HUD unless an application has been submitted, 42 U.S.C. § 5304(a) (Supp. V 1975), and the application *must* include a HAP that, *inter alia*, "assesses the housing assistance needs of lower-income persons . . . residing in or expected to reside in the community." *Id.* § 5304(a)(4)(A). While certain other application requirements may be waived by HUD, the HAP requirement may not be waived. *See id.* § 5304(b)(3), (4); 408 F.Supp. at 898, 901. Both Congress and HUD have emphasized the importance of the HAP. *See* H.R.Rep. No. 93–1114, 93d Cong., 2d Sess. 3 (1974), *quoted in* panel op., *ante*, at 1036 n. 8; HUD Notice of Proposed Rulemaking, 41 Fed.Reg. 2348 (1976), *quoted in* panel op., *ante*, at 1036 n. 9.

The significance of the ETR figure is apparent when the HCDA's "carrot and stick" approach is considered. All communities, wealthy as well as poor, are interested in obtaining community development funds, which may be used for such local needs as street lights, playgrounds, and senior citizen centers. *See* 42 U.S.C. § 5305(a) (Supp. V 1975); 24 C.F.R. § 570.200(a) (1976). In order to obtain these funds under the Act, however—and this is what is of critical importance—"a locality must address its need for lower-income housing," United States Commission on Civil Rights, *Twenty Years After Brown: Equal Opportunity in Housing* 32 (1975). This need

---

**3.** In light of this statement and the Act's reference to "the isolation of income groups within communities and geographical areas", 42 U.S.C. § 5301(c)(6) (Supp. V 1975), it is little short of incredible that the plurality opinion expresses doubt whether the HCDA was intended to promote intercity spatial deconcentration, *ante* at 1050 n. 2. *See also* 42 U.S.C. § 5301(a)(1) (Supp. V 1975) (congressional concern about "the concentration of persons of lower income in central cities"); *id.*

§ 5304(a)(1) (development planning to be on "areawide" basis); *id.* § 5304(a)(4)(C) (lower-income housing to be located with objective of "avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons"). If nothing else were clear, it is at least clear that the Housing and Community Development Act of 1974 was not just another simple form of revenue-sharing with suburbs walling out the cities' poor.

simply cannot be addressed without an accurate estimate of the number of lower-income persons expected to reside in the locality. The ETR figure is tied directly to housing assistance by 42 U.S.C. § 1439(a) (Supp. V 1975), which allows either a locality or HUD to reject an application for federal housing aid on the ground that it is inconsistent with the locality's HAP.

Once the operation of the statute and the characteristics of Hartford are understood, the nature of Hartford's injury from the suburban towns' submission of zero or inadequate ETR figures becomes clear. As a central city, Hartford has been given by the HCDA "a statutory right or entitlement," *Warth v. Seldin*, 422 U.S. 490, 514, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), to cooperation from its suburbs (at least those applying for community development grants) with regard to the deconcentration of lower-income persons and the elimination of slums and blight, 42 U.S.C. § 5301 (Supp. V 1975). An alleged deprivation of such a right creates standing. *Warth v. Seldin, supra,* 422 U.S. at 514, 95 S.Ct. 2197. By submitting zero ETR figures, the defendant towns significantly reduced the likelihood that any deconcentration beneficial to Hartford would occur.[4] For example, were a developer to apply for federal aid in building lower-income housing in one of the towns, the town could legitimately oppose the request—and thus effectively block construction of lower-income housing—simply by

objecting under 42 U.S.C. § 1439(a)(2) (Supp. V 1975) that such housing is inconsistent with its approved HAP, which indicates that no additional lower-income persons are expected to reside in the town. The Act was designed to prevent abuses of this sort, and it seems probable that no entity other than a city like Hartford would be interested in halting such violations of the letter and spirit of the law, at least when HUD is countenancing these violations. In short, I believe that Hartford stood to benefit from this suit both by forcing a change in overall HUD policy—a benefit that has been realized—and by forcing its suburbs to assist with the HCDA's spatial deconcentration objective in return for their receipt of community development funds—a benefit that, to the extent ETRs have been revised upward in the resubmitted applications, also has been realized.

### III.

### *The Law of Standing*

The plurality and concurring opinions both adopt a standing test based on the fact that, under the district court's injunction, the defendant towns could either revise their ETR figures or forego community development grant funds. From this the plurality concludes, citing *Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. 2197: "Inasmuch as the first alternative would produce no benefit for plaintiffs, it is immaterial

---

**4.** The plurality and concurring opinions both mention that there were no more fiscal 1975 Title II funds available for the defendant towns, even if their ETR figures for that year were revised upward. The location and types of lower-income housing, however, might very well be affected by appropriate revision of the ETR figures; certainly Congress thought that there would be some impact when it required the ETR estimates. Moreover, the chronological relationship between the Title I Hap and the Title II housing grants is unclear on the record before us. It appears from the regulations that Title II funds for at least two fiscal years after 1975 may be based on the 1975 HAPs. The community development plan summary submitted with the application is a "three-year . . . plan which . . . specifies both short and long-term community development objectives which have been devel-

oped in accordance with areawide development planning and national urban growth policies." 24 C.F.R. § 570.303(a) (1976). The ETR assessment required to be included in the HAP is a projection covering "the next three years." *Id.* § 570.303(c)(2)(i). The HAP must specify "a realistic annual goal and also a three year goal for the number of dwelling units or persons to be assisted." *Id.* § 570.303(c)(3). And it is to be noted that:

> Where substantial housing needs are identified pursuant to paragraph (c)(2) of this section, and housing assistance resources are available, the Secretary may determine that Housing Assistance Plans with only minimal housing goals are plainly inappropriate to meeting the needs pursuant to the standards of review in § 570.306(b).

*Id.* § 570.303(c)(3)(v).

whether they might benefit from the second . . . ." Ante, at 1051. The concurring opinion's similar conclusion is said to be compelled by Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Parts I and II of this dissent demonstrate how the factual premise of both opinions is erroneous. Here I point out that no legal analysis is offered in either opinion to explain how Warth and Simon, in which plaintiffs sought invalidation of legislative or executive rules, are relevant to a case involving a district court injunction that gives the defendants a choice of actions. Both cited cases do, of course, contain general language about the necessity for a plaintiff to show "a substantial probability" of benefit from judicial intervention, Warth, 422 U.S. at 504, 95 S.Ct. 2197, or "an injury to himself that is likely to be redressed by a favorable decision", Simon, 426 U.S. at 38, 96 S.Ct. at 1924. But these unexceptionable propositions hardly help to resolve this case; they are simply the starting point of analysis.

Even assuming arguendo that the option given the localities is relevant to Hartford's standing to challenge HUD policy—as discussed in Part I supra, the suit's principal purpose was to force a change in a HUD policy that was adversely affecting the City of Hartford—I cannot accept the factual premise that upward revision of the defendant towns' ETR figures would produce no benefit for Hartford. I have discussed the way in which Hartford would benefit in Part II. It is true that the injury is indirect, but the Supreme Court recently reaffirmed that such injury is sufficient for standing purposes if it is "fairly traceable to the defendant's acts or omissions", Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 260, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Here the injury to Hartford is traceable to the towns' submissions and HUD's approvals of inadequate HAPs, as discussed in Part II. It may also be true that the injury to Hartford is not directly measurable in

dollars and cents; "[i]t has long been clear," however, that other kinds of injury than the purely monetary will support standing, id. Finally, the injury alleged plainly has "that 'essential dimension of specificity' that informs judicial decisionmaking." Id., quoting Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Hartford did not seek an abstract change in HUD policy, but rather a specific remedy with regard to particular grant applications made by its suburbs whose applications did not conform to the statutory requirements.

I therefore restate that the factual premise of the majority's approach is unsupportable. But even if it is assumed arguendo that Hartford would not benefit from revision of the ETR figures, there nevertheless was a sufficient probability of Hartford's obtaining reallocated funds to support the City's standing here. The injunction blocked over four million dollars in grant funds to seven towns. A prediction made when the suit was filed would have to have acknowledged a "substantial probability" that at least some of those funds would be reallocated to Hartford as the result of a town choosing not to, or being unable to, submit an acceptable ETR figure, and indeed time has shown that monies would but for the instant decision en banc have become available for reallocation.[5] Hartford's eligibility therefor is discussed in the panel majority opinion. Ante, at 1037; see 408 F.Supp. at 885–86. It matters not at all how small the predicted sum might be, as long as "a distinct and palpable" benefit were involved. Warth v. Seldin, supra, 422 U.S. at 501, 95 S.Ct. 2197; see K. Davis, Administrative Law of the Seventies § 22.-02–10, at 507 (1976) ("The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." ).

As in Arlington Heights, supra, 429 U.S. at 261, 97 S.Ct. at 561, "[a]n injunction would not, of course, guarantee" that grant funds would be reallocated; "uncertainties" would remain. But the Supreme Court in

5. The supplemental brief of HUD as amicus curiae tells us that two municipalities did not submit applications pursuant to the revised procedures. HUD tells us that absent affirmance it will remove the "holds" on these funds.

*Arlington Heights* made clear that such uncertainties do not defeat a standing claim. *Id. See also United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The plurality and concurring opinions appear to demand more, something approaching a certainty that funds would be reallocated to Hartford. There is scarcely any lawsuit that involves a certainty of recovery, from administrative law to zoning. Such a standard has no support in *Warth* or *Simon*, much less in the more recent *Arlington Heights*; its adoption here significantly raises the barriers a litigant must cross in attempting to challenge illegal governmental action.

Hartford has shown injury to itself and a probability of benefit from judicial intervention. It should therefore be held to have standing. To deny Hartford standing means, in Chief Judge Kaufman's words, that "it is unlikely that there could ever be a plaintiff who will be allowed access to the courts to challenge HUD's abdication of its congressionally-imposed duty." *Evans v. Lynn*, 537 F.2d 571, 611 (2d Cir. 1976) (opinion dissenting from en banc decision), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Today's holding, in short, "give[s] the Executive a silent veto not provided in the Constitution." *Id.* (Gurfein, J., dissenting from en banc decision). I dissent.