**HUNTINGTON BRANCH NAACP, Housing Help, Inc., Mabel Harris, Ella Owens, Carrie Howard, Thelma Latta, Perrepper Crutchfield, Kenneth L. Cofield, Plaintiffs,**

**v.**

**The TOWN OF HUNTINGTON, NEW YORK, United States Department of Housing & Urban Development, Samuel Pierce, Kenneth C. Butterfield, Claire Kroft, Kenneth Deegan, Edward Thompson, Joseph Clemente, Defendants.**

No. CV–81–541.

United States District Court,
E. D. New York.

Jan. 18, 1981.

Richard F. Bellman, Steel & Bellman, New York City, Thomas I. Atkins, Curtis Rodgers, and Margrett Ford, N. A. A. C. P., New York City, for plaintiffs.

Charles S. Kleinberg, Asst. U. S. Atty., Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for defendants HUD and Pierce.

Richard C. Cahn, Melville, N. Y., for defendants Town of Huntington, Butterfield, Kroft, Deegan, Thompson, and Clemente.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

This is a class action[1] brought on behalf of black, Hispanic and lower income persons residing in the Town of Huntington and its surrounding areas who allegedly would qualify for residency in housing areas developed with the support of funding obtained pursuant to the Housing & Community Development Act of 1974. 42 U.S.C. § 5301 *et seq.* Specifically, the plaintiffs claim to have been injured by discriminatory housing and zoning practices within the meaning of the Fourteenth Amendment and, more importantly, Title VIII of the Civil Rights Acts of 1968, 42 U.S.C. § 3601 *et seq.*, which was designed to provide fair housing throughout the nation. In addition, plaintiffs have filed other causes of action based on 42 U.S.C. §§ 1981, 1982, 1983, and the New York State Town Law.

The named plaintiffs are as follows: Huntington Branch, National Association for the Advancement of Colored People ("NAACP"), whose purpose in society is to eliminate racial discrimination in housing, employment, education and other areas; Mabel Harris, the president of the NAACP in Huntington; Housing Help, Inc., a not-for-profit corporation which assists low income and minority people in securing housing in Huntington and its vicinity and also promotes low and moderate income housing in the Town of Huntington and its vicinity; and lastly, Ella Owens, Carrie Howard, Thelma Latta, Perrepper Crutchfield, and Kenneth L. Cofield, members of a minority and/or low income group who wish to obtain affordable housing in the Town of Huntington, but to date have been unable to do so because of its unavailability.

The Town of Huntington defendants are as follows: the Town of Huntington, a municipal corporation organized pursuant to the Town Law of the State of New York; Kenneth Butterfield, Supervisor of the Town of Huntington; and Claire Kroft, Kenneth Deegan, Edward Thompson and Joseph Clemente, members of the Huntington Town Board. These defendants will be referred to in this opinion as merely the

---

1. This action was brought on as a class action under Fed.R.Civ.P. 23, but because of the court's decision herein, the merits of proceeding as a class have not been reached.

"Town of Huntington." The complaint was also filed against two federal defendants: the United States Department of Housing and Urban Development ("HUD"), and Samuel Pierce, the Secretary of HUD. These two defendants will be referred to jointly as "HUD."

These proceedings are now before the court on a motion to dismiss by both HUD and the Town of Huntington.[2] While the defendants set forth numerous grounds for dismissal, both HUD and the Town of Huntington maintain that the case must be dismissed for lack of standing. The court agrees, and for reasons set forth below, the action is dismissed. Before setting forth the court's conclusions of law, the court finds it necessary to provide a background to these transactions and the pertinent facts to date.

## I. BACKGROUND

### A. *Housing Assistance Plans*

To receive federal funds available through Community Development Block Grant ("CDBG") programs,[3] a town must submit to HUD a Housing Assistance Plan ("HAP") prepared in accordance with the Housing and Community Development Act of 1974.[4] The HAP must specify the housing needs of the municipality and the municipality's realistic goals to accommodate community housing assistance needs, including goals for the new construction of

HUD assisted rental units. *See* 42 U.S.C. § 5304. If the goals for HUD assistance are unrealistic in light of present and expected availability of funds, HUD cannot approve the HAP submitted. 42 U.S.C. § 5304(a)(4)(B); 24 CFR § 570.306(b)(3)(i). Each HAP generally covers a three-year period.

The most recent Town of Huntington HAP provides for years 1979–1982, which encompasses fiscal years 1980, 1981, and 1982 and becomes ineffective on October 1, 1982. With reference to the goals for the new construction of HUD assisted rental units, the recently revised HAP currently in effect for the Town of Huntington has "zero" goals for these projects. Since there are no funds presently available for such construction, HUD maintains that it approved Huntington's HAP as the goals provided therein are realistic under the circumstances. However, HUD has notified Huntington that if sufficient funds become available, then HUD will require Huntington to amend its 1979–1982 HAP to include a goal for the construction of 100 newly created units of new or substantially rehabilitated rental housing.

### B. *Procedural Requirements for Assistance and Proposed Huntington Projects*

Two procedures are available to receive funding from HUD and both have been the

---

**2.** Plaintiffs have also moved to amend their complaint pursuant to Fed.R.Civ.P. 15(a) and/or 15(b) to add a fifth cause of action challenging HUD's ranking of the Matinecock Court proposal. Amending the complaint to include such a claim would not alter the court's decision so the motion must be denied. However, for purposes of discussion in the court's opinion *infra*, the plaintiffs' contentions in the fifth cause of action will be discussed with plaintiffs' other claims.

**3.** 42 U.S.C. § 5304(a)(2) (1981 Supp.) provides:
No grant may be made pursuant to . . . this title unless an application shall have been submitted to the Secretary in which the applicant—
(2) formulates a program which (A) includes the activities to be undertaken to meet its community development needs and objectives, together with the estimated costs and

general location of such activities, (B) indicates resources other than those provided under this chapter which are expected to be made available toward meeting of its identified needs, activities, and objectives, including activities designed to revitalize neighborhoods for the benefit of low- and moderate-income persons, and (C) takes into account the effect of such activities on the involuntary displacement of low- and moderate-income persons and takes into account appropriate environmental factors;
Accordingly, CDBG funds can be used only to subsidize community development activities. The funds cannot themselves be used to build or provide rent subsidies for newly constructed low-income housing.

**4.** *See* 42 U.S.C. §§ 1437, 1439; 42 U.S.C. §§ 5301–17.

source of controversy in this case. First, applications for new construction funds under Section 8 of the Housing and Community Development Act, 42 U.S.C. § 1437f, can be made pursuant to a Notice of Funding Availability ("NOFA"). When funds become available, HUD publishes a NOFA to which developers respond with preliminary proposals for housing projects in a given sub-area. The proposals in the sub-area—in this case Suffolk County—are then ranked against each other to determine priority for the available funds. This determination is based upon various factors including the proposed rents, design of the proposal, comments of the local municipality, feasibility of the project, and feasibility of the proposed location. HUD's approval of such an application is not a commitment for funds because all commitments are conditioned upon the submission of a final, more detailed proposal and HUD's approval thereof.

A NOFA was published by the HUD New York Area office for all of Suffolk County on June 19, 1980, and on August 28, 1980, plaintiff Housing Help, a Huntington based nonprofit organization, submitted to HUD a preliminary proposal called "Matinecock Court" in response to the June 1980 NOFA. The Matinecock Court proposal was for 162 units at a cost estimate of $1,820,000.00.[5] After being ranked against sixteen other proposals submitted in response to the June 1980 NOFA, this project and "Huntington Park", the only other project submitted

from Huntington, were tied with four other proposals for sixth place.[6]

Although it did rank the Matinecock Court proposal, HUD could not approve the project because the Town of Huntington objected to the Matinecock Court proposal. An application for housing assistance submitted to HUD from a private developer, such as Housing Help, Inc., rather than a municipality, must be forwarded for "comment" to the municipality in which the proposed project is to be built. If the town objects to the application on the grounds that it is inconsistent with its HAP, and HUD agrees that an inconsistency exists, then HUD cannot approve the application. 42 U.S.C. § 1439. Furthermore, if the number of proposed units in the application exceeds the town's HAP goal by more than 20%, then HUD cannot approve the application.

Thus, the Matinecock Court proposal was objected to by Huntington on two grounds. First, the project was inconsistent with Huntington's zoning ordinances since the area in which Housing Help proposed to build Matinecock Court did not provide for multi-family housing.[7] Second, the project was inconsistent with the 1979–1982 Huntington HAP which set forth "zero" goals for Section 8 assisted rental unit facilities. As noted, while it was ranked against the other Suffolk County proposals, Matinecock Court proposal was not approved by HUD.

---

**5.** At the time the proposal was submitted, Housing Help had an option to purchase the 14.6 acre tract of land upon which it intended to build Matinecock Court.

**6.** Since the sixteen proposals submitted in response to the June 1980 NOFA were not received by HUD until the end of August 1980, the proposals could not be processed and ranked before September 30, 1980. The funds are distributed on a fiscal year basis; therefore, the proposals competed for 1981 funds. These funds, to have been made available pursuant to the June 1980 NOFA, are not forthcoming because of recent cutbacks in funding. In fact, Section 8 new construction money for 1981 was eliminated. Accordingly, *none* of the sixteen proposals submitted in response to the June 1980 NOFA received funding.

**7.** The situs for Matinecock Court is zoned for one acre single family houses only. Multi-family housing construction is permitted only if the development is to be owned, maintained, and operated by the Huntington Housing Authority, or is within the urban renewal section of Huntington as provided by the Town's Comprehensive Plan. Since the Matinecock Court project is not within that section of Huntington and Housing Help is not associated with the municipality, the Town's zoning ordinance would have to be amended to permit multi-family residential construction by private developers in the area in which Matinecock Court is proposed.

Mainly on the basis of the Town of Huntington's objections to the Matinecock Court proposal, the plaintiffs allege in count one of the complaint that Huntington, through its zoning laws and the disapproval itself, had discriminated against the plaintiffs in violation of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, et seq.; 42 U.S.C. §§ 1981, 1982 and 1983; and the Fourteenth Amendment. In count four, the plaintiffs in a pendant claim also contend that Huntington's zoning laws as applied to the Matinecock Court parcel of land are exclusionary, discriminatory and illegal under New York Town Law.

While the second method for obtaining funding has not directly led to problems in this action, it nonetheless merits discussion in that it sheds light on the plaintiffs suit against HUD because according to plaintiffs, it explains the low ranking that Matinecock Court received for its NOFA proposal. In the second method, known as the "Pre-Approved Site" procedure, municipalities are allowed to receive priority for Section 8 new construction funds so as to allow them to coordinate their community development activities with Section 8 construction. If pre-approval is granted, HUD can reserve the funds necessary to support the proposed construction thereby ensuring that funds for the ultimate proposal will be available. This also is conditional upon submission of a final proposal for a project to HUD and approval thereof. Like NOFA proposals, a proposal via the pre-approved site method must also meet HUD's site and neighborhood to receive approval by HUD, but unlike NOFA proposals, it does not compete with other proposals.

In seeking such funds, the Town of Huntington submitted to HUD the "Huntington Station" site, a 150-unit project, for pre-approval. HUD granted pre-approval conditioned upon Huntington's amendment of its 1979–1982 HAP, which did not provide for new construction of HUD assisted rental units. Dependent on compliance with that condition, $1,012,140.00 was reserved from 1980 funds for the Huntington Station side. Thereafter, Huntington withdrew the Huntington Station proposal.[8] However, Huntington did revise its 1979–1982 HAP to once again specify "zero" goals for both HUD assisted newly constructed rental units and for HUD assisted substantially rehabilitated rental units.[9]

In reviewing the complaint and proposed amended complaint, the plaintiffs maintain that HUD's initial approval of the HAP for the Town of Huntington and presumably the amended HAP violated the provisions of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq., in that the approval of the HAP with "zero" goal for Section 8 funding has "contributed to the perpetuation of racial discrimination, isolation and segregation in housing in the Town of Huntington and has encouraged and contributed to the discriminatory interference by Huntington Town with the Matinecock Court project." Amended Complaint, ¶ 63. In addition, the amended complaint asserts that HUD's pre-approval of the Huntington Station project caused the Matinecock Court proposal sub-

8. When these reserved funds site were not ultimately committed by HUD to the building of the Huntington Station project, the funds were classified as "recaptured" and were used to increase the funding on previously approved projects in the New York area that require additional money to remain feasible, and then only with the express authorization of the HUD Assistant Secretary of Housing.

Although not specifically discussed by the plaintiffs, even if these recaptured funds amounting to approximately $1,012,140.00 were used to fund the Matinecock Court project, this would still not be sufficient to fund the project as plaintiff Housing Help estimates that the project would cost at least $1,820,-

000.00 to complete. To be built, the Matinecock Court project would require additional funding.

9. Due to the severe cutbacks in funding allocations, the policy in the New York Area Office of HUD is not to disapprove any HAPs which fail to increase the goals for HUD assistance and in light of such cutbacks, are realistic under the circumstances. Accordingly, this HAP was approved in view of current and projected availability of funding, but the Town was informed that should funds become available, Huntington will have to amend its HAP to include goals for Section 8 funding.

mitted in response to the June 1980 NOFA to receive a low ranking.[10]

## II. CUT–BACKS IN FUNDING AND PLAINTIFFS' STANDING

Among the numerous answers given to plaintiffs' contentions, defendants have asserted that no federal funds are available to subsidize the proposed project, and therefore, the plaintiffs are without a remedy. Although plaintiff NAACP contests this in its Memorandum in Opposition by characterizing it as a "self-serving [statement] by a HUD official", plaintiffs do not substantiate their objection in any way, FRCP Rule 56(e), and thus we must consider this factor in determining whether the plaintiffs have standing before the court to litigate their claims because, without federal funding, it is undisputed that plaintiffs will be unable to build Matinecock Court or any other project.

The status of funding for HUD's New York office for the Fiscal Year 1981 is in a current state of flux. Section 8 new construction and substantial rehabilitation funds have been eliminated entirely. The only funding presently available for use in Suffolk County is enough to fund 35 units in the Town of Smithtown. The only other potential source of HUD funding for Fiscal Year 1981 is a special pool for 1500 units of new construction to be spread throughout the entire nation. Indeed, it is quite clear that there is no guarantee that HUD will receive any funding to subsidize HUD assisted newly constructed rental units in Suffolk County for the Fiscal Year 1981.

## III. CONCLUSIONS OF LAW—STANDING

■ In responding to defendants' challenges to plaintiffs' standing, the court must first ascertain whether the defendants' acts injured the plaintiffs, and second, whether the plaintiffs' injury is capable of redress. See Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In answering these questions, the court will focus on how they separately relate to the Town of Huntington and HUD. What is quite clear, however, is that for this court to redress plaintiffs' injury, if any, the plaintiffs must receive some form of Section 8 funding.

### A. Plaintiffs Standing to Challenge HUD's Approval of the 1979–82 HAP

■ The plaintiffs maintain that HUD's approval of the 1979–82 Huntington HAP, containing "zero" goals for newly constructed or rehabilitated HUD assisted rental housing, was a violation of law, and ultimately caused the Matinecock Court project to receive a low ranking. However, if HUD forced the Town of Huntington to amend the HAP to include new goals consistent with the plaintiffs' wishes, it would not change the current status quo since there are no funds available for Fiscal Year 1981 to subsidize such housing.

In determining whether these plaintiffs have standing to challenge HUD's approval of the 1979–82 HAP, the court must examine the facts herein in light of the Second Circuit's holding in City of Hartford v. Towns of Glastonbury, 561 F.2d 1032, 1048 (2d Cir. 1977) (en banc), cert. denied, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978). See, Comment, City of Hartford v. Towns of Glastonbury: Standing to Challenge Federal Agency Actions, 52 St. John's L.Rev. 225 (1978).

Briefly, the plaintiffs in City of Hartford sued several suburban communities and HUD to enjoin them from receiving or expending grants-in-aid approved by HUD on the ground that the defendants' HAPs contained either no estimate or an entirely inaccurate estimate of the number of low income people "expected to reside" within the defendants' respective communities in apparent violation of 42 U.S.C.

---

**10.** In the original complaint, one of plaintiffs' causes of action was based on HUD's approval of the Huntington Station proposal itself. After the withdrawal of that proposal, the court dismissed this cause of action on June 24, 1981.

This is different from the claim in the amended complaint which alleges that the pre-approval of Huntington Station caused the Matinecock Court proposal to receive a low ranking from HUD.

§ 5304(a)(4)(A). The defendants questioned the plaintiffs' standing to challenge the failure to include an accurate "expected to reside" in their HAPs because plaintiffs were unable to show that they were either injured by such failure or would be helped if the HAPs were amended. Before making its ruling, Judge Meskill, writing for a plurality of the court in an *en banc* decision, made the following observation:

> It is our task to determine whether they have standing to make such a challenge. The applicable standards are clear:
>
>> "The essence of the standing question, in its constitutional dimension, 'is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.' ... The plaintiff must show that he himself is injured by the challenged action of the defendant. The injury may be indirect ... but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions."
>
> *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 260 [97 S.Ct. 555, 560, 50 L.Ed.2d 450] (1977) (citations omitted). Furthermore, the plaintiff's injury must be one which is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38 [96 S.Ct. 1917, 1924, 48 L.Ed.2d 450] (1976). In other words, a plaintiff must show injury; he must trace it to the defendant's allegedly unlawful acts; and he must show that the remedy he seeks is likely to redress his injury.

*Id.* at 1050. Judge Meskill, in holding that the plaintiffs lacked standing, ruled that forcing the defendants to adjust their "expected to reside" calculations would not benefit the plaintiffs because all the subsidies had been exhausted and there were no funds then available for redistribution.

> Here, it is probable that the lack of compliance with the Act did not affect plaintiffs at all. The defendant Town's housing assistance plans *have fully utilized all of the funds available for low-income housing subsidies under Title II of the Act.* Because the only effect of the expected to reside figure is indirect—via [housing assistance] subsidies—and because *no additional [housing assistance] subsidies are available, it is unlikely that the lack of expected to reside figures had any effect on the interests of the plaintiffs.*

*Id.* at 1051 (emphasis supplied). In finally dismissing the complaint Judge Meskill concluded that

> It is speculative whether the relief sought by the plaintiffs ... will redress their alleged injury.
>
> \*       \*       \*       \*       \*       \*
>
> Thus, we conclude that the plaintiffs have failed to trace their alleged injury to the allegedly unlawful conduct of the defendants, and they [plaintiffs] have failed to demonstrate that the relief they seek would serve to redress that injury.

*Id.* at 1051–52.

In the present action, this court must apply a similar rationale. In their case against HUD, plaintiffs maintain as noted that HUD's approval of the 1979–82 Town of Huntington HAP which contains "zero" goals for newly constructed or rehabilitated HUD assisted rental housing, was a violation of the Housing & Community Development Act of 1974, 42 U.S.C. § 5301, *et seq.* However, whether the 1979–82 Huntington HAP was improperly approved by HUD is irrelevant at this point; what is relevant is that, even if HUD forced the Town of Huntington to amend its HAP to include new "goals" consistent with the plaintiffs' wishes, it would still not change the current status quo and enable plaintiffs to obtain their ultimate remedy—the construction of Matinecock Court—because there are no funds now available for Fiscal Year 1981 to subsidize such housing.

Nonetheless, plaintiffs argue that the Supreme Court's holding in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50

L.Ed.2d 450 (1977) compels a contrary conclusion. In *Arlington Heights*, the plaintiff, Metropolitan Housing Development Corp. ("MHDC"), was a developer who was challenging the zoning of the Village of Arlington Heights. In ruling that MHDC had standing, the *Arlington Heights* court noted even though "MHDC would still have to secure financing," *id.* at 261, 97 S.Ct. at 561, and would still have to "qualify for federal subsidies," *id.*, this would not preclude MHDC from litigating the claim for lack of standing. It is clear from the decision, however, that there was a strong likelihood that subsidies would be available in the near future for housing-assistance programs. *Id.* at 261 n.7, 97 S.Ct. at 561 n.7. Here, as in the *City of Hartford v. Towns of Glastonbury, supra*, the situation is quite dissimilar; there are no Section 8 new construction or substantial rehabilitation funds now available and it is unlikely that any such subsidies will be available in the near future. Accordingly, it is quite clear that the relief sought against HUD—forcing HUD to amend its HAP to reflect accurately the housing need of the Huntington community—would hardly alleviate any injury possibly suffered by plaintiffs.

Moreover, while a reading of the cases discussed below and cited by plaintiffs support a standing argument generally, they do not support the argument that an absence of funds would not preclude a review of HUD's action on standing grounds. In *Kennedy Park Homes v. City of Lackawanna*, 436 F.2d 108, 112 (2d Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), standing was upheld since the Mayor of Lackawanna refused to sign a necessary sewerage permit, which was preventing plaintiffs from proceeding with their low-income housing proposal for which federal funds were available. Likewise, in *Dailey v. City of Lawton*, 425 F.2d 1037, 1038 (10th Cir. 1970), the City refused to issue a building permit for the low-income project, and the plaintiffs therefore had standing to challenge this action. But unlike the situation at bar, funds were available to HUD for distribution. Also in *United Farmworkers v. Delray Beach*, 493 F.2d 799, 801, 808 (5th Cir. 1974), federal funds to subsidize the proposed project were available, but the City refused to permit the project to tie into the City's water and sewerage systems. Finally, in *Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1211, 1215 (8th Cir. 1972), not only were federal funds available, but they were initially reserved for the proposed project. The impediment to plaintiffs therein was that a zoning ordinance subsequently passed effectively prevented construction of the multi-family housing project.

It is apparent that none of these cases, which uphold the standing of parties in cases dealing with the funding of low income housing proposals, involves a situation such as this where federal subsidy funds are simply not available and are not presently forthcoming. Alternatively, *City of Hartford v. Towns of Glastonbury, supra*, is controlling and that case mandates a dismissal. If sufficient funding does become available, plaintiffs are invited to reinstitute this action against HUD. At this time however, plaintiffs have no standing to pursue their claim against HUD. Accordingly, the claims against HUD are dismissed.

### B. Plaintiffs Standing to Challenge the Town of Huntington's Zoning Laws and the HAP Submitted By the Town of Huntington

As with the causes of action against HUD, the thrust of plaintiffs' primary claim against the Town of Huntington is that Huntington's inaccurate and illegal HAP caused the Matinecock Court proposal to be disapproved by HUD because the proposal was inconsistent with that HAP. In addition, plaintiffs allege that Huntington's zoning laws discriminate against minorities and are illegal under both state and federal law.

The remedy that plaintiffs seek includes ordering the Town of Huntington to amend its HAP to accurately reflect the housing needs of the community, as well as ordering the Town to amend its zoning laws

**846**

to remove the zoning bar to the construction of Matinecock Court. The ultimate relief, however, is to enable Matinecock Court to be built. Thus, the court must determine "[w]hether termination of all available assistance programs would preclude standing . . . ." *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 261 n. 7, 97 S.Ct. at 561 n. 7. The court concludes that such unavailability of funds does prohibit the litigation of these claims for lack of standing.

The court bases this decision on the philosophy enunciated by the Second Circuit in the *City of Hartford v. Towns of Glastonbury, supra.* While *City of Hartford* is distinguishable in that plaintiffs claims against the Town of Huntington are not against a federal agency, the reasoning which led to the Second Circuit's decision is equally applicable. As with the case against HUD, if the court ordered the Town of Huntington to submit an amended HAP and to amend its zoning laws, the Matinecock Court proposal would still not be built because of the current lack of Section 8 funds. The essence of deciding a case is to afford the litigants a remedy, and the court does not and cannot decide issues in a vacuum. In the instant case, it is clear that the court cannot offer the plaintiffs the ultimate remedy they seek. *See Village of Arlington Heights v. Metropolitan Housing Development Corp., supra; Warth v. Seldin, supra.* Accordingly, the court must dismiss the claims against the Town of Huntington.

The complaint is dismissed in all respects.

So Ordered.